## LEE v. STATE.

(In Banc. May 12, 1931.)

[134 So. 185. No. 29141.]

**Myron S. McNeil**, of Hazelhurst, and **Thames & Thames**, of Vicksburg, for appellant.

**W. A. Shipman**, Assistant Attorney-General, for the state.

**Ethridge, J.,** delivered the opinion of the court.

Appellant, W. P. Lee, on August 9, 1930, killed one Clarence Lanier, a deputy sheriff of Warren county, Mississippi. On August 13, 1930, the circuit judge called a special term of the circuit court to convene the 3d day of September, 1930, for the trial of criminal business. There was some excitement at the time of the killing, and the appellant was removed from Warren county to some place for safekeeping. The indictment being returned on the first day of court, the appellant filed a motion for a continuance of his case, setting out that he could not obtain a fair trial on account of the great excitement prevailing and the publicity given his case in the newspapers, and that he did not have reasonable time to prepare for trial. In connection with this motion it appeared that immediately after the killing the district attorney went to the scene and there took statements from all the witnesses which were taken down by the court reporter and reduced to writing.

The appellant, having moved from Copiah county to Warren county a short time before the killing occurred, procured an attorney from Copiah county to defend him. This attorney was busy at the time of his employment, but as soon as practicable he went to the scene of the killing and sought to learn the facts from the people living there. He was informed by these people that the district attorney had taken their statements in writing, and that he would find them at the courthouse. He went to the district attorney, and requested to see these statements, but the district attorney refused to allow him to do so. He then told the district attorney that the witnesses seemed to be under the impression that they were not authorized to talk after giving such statements, and requested the district attorney to give a statement to said parties that they were authorized to discuss the killing and talk to said attorney about it. This the district attorney likewise refused to do, but agreed, as a condition of telling them that they could talk, that they do so in the presence of a representative selected by the state, which condition was, by defendant's attorney, refused.

When court met, an indictment was returned, and the defendant's attorney asked the court to require the district attorney to furnish him with these statements of witnesses, which the court refused to do.

It appears that, when the killing occurred, the newspaper carried accounts in which it was stated that the killing of Lanier, who was a deputy sheriff, occurred during a raid being made upon appellant's place of business in search of intoxicating liquors. The report of the killing was sensational in character, highly unfavorable to the appellant. The appellant, in seeking a continuance, did not seek or desire a change of venue, but, as stated, sought a continuance because of inadequate time to prepare his defense, and because of the public excitement, due to the wide publication of the newspaper, carrying the idea that the killing occurred during a raid by the officers in search of the appellant's premises.

It appears that the place where Lee, appellant, was doing business in Warren county was known as the ''Log Store,'' and that, prior to Lee's occupancy of this building, it had acquired a reputation as being a dispensary of intoxicating liquors, or a place where same could be procured. There had been several raids of the premises of Lee after he started a store or business there, but no liquor had been found.

As a background to this transaction, it appears that Lee sought to prove, but was not permitted to do so, that, shortly after he opened his business at the Log Store, Lanier, who lived nearby, approached him and demanded fifty dollars, stating that if it was not paid he would have Lee raided; that Lee told him that he did not have, and was not selling, liquors, and had no fifty dollars to pay; that shortly after this interview he was, in fact, raided, but the officers found no liquor; that Lanier again approached Lee, demanding fifty dollars or liquor, and stated that the Log Store was known as a ''blind tiger,'' and that Lee could not do business there and sell liquors without paying the officers fifty dollars; that Lee again refused to do this, stating that he had no liquors and would not pay the money, and he was again raided; that at another time, the deceased, Lanier, approached Lee about the payment of money and stated that, if he did not pay this money or give him liquors, he (Lanier) would run Lee out of the county; that nobody could sell liquors without paying for so doing; and that Lee again refused, and was again raided, but the officers found no liquors there.

The proof on the motion to continue in regard to the public excitement was limited to the introduction of the newspaper reports carried at the time, which reports not only alleged that Lee was raided and the officer was killed in the raid, but also that he was spirited away to an unknown place, and there were unfavorable accounts of what happened at the time of the killing.

The appellant did not show by witnesses what effect these newspaper accounts produced upon the public mind, and the only account we can get as to the effect on the public mind, other than the newspaper reports, is the voir dire examination of the special venire impaneled to try the case. A careful reading of the evidence on the voir dire examination indicates that, while the case was discussed, the jurors had no fixed opinions, some of them stating that they read the accounts and thought at the time they were correct, but they had heard other things subsequent thereto which changed their minds. The jurors did not seem to have been unduly impressed with the newspaper accounts. It rather appears that they took these reports with an idea that they were "played up" or exaggerated, and they reserved judgment of the facts until more was heard. Some of the jurors stated that there were always two sides to matters of this kind.

It appears that, on the day of the killing, Lanier, the deceased, was passing the Log Store, where there was also a filling station, and Tucker, son-in-law of Lee, who was jointly indicted with him, cried out, "Whoopee, drunk again," and Lanier stopped his car and asked Tucker why he was always "hollering" at him, and Tucker said he was not "hollering" at Lanier, and that he did not know he existed, and some words passed between Tucker and Lanier, the latter telling Tucker the matter had to stop, and Lanier then went to his home. Late in the evening Lanier came back by the Log Store, which was situated in the fork of the Vicksburg and Jackson road and the Vicksburg and Utica road, and turned in the direction of the Jackson road in front of the store. Tucker, who was across the road from the store, when Lanier came up, again cried out: "Whoopee, drunk again." Lanier stopped his car, got out, and proceeded in Tucker's direction, and again protested against Tucker "hollering" at him in this manner, and Tucker

again told him he was not "hollering" at him, and did not know he was living, or some such similar remark. Tucker started in the direction of Lanier during the altercation, and, according to some of the evidence, Lanier pulled his pistol from its scabbard. Tucker then proceeded into Lee's store, stating as he went to Lanier, "Wait here until I come back, we will settle this," and stated that he would make him eat that popgun he had. Lee, at that time, was sitting on the gallery facing where Lanier and Tucker were, and, as Tucker proceeded into the store, Lanier followed in the direction of the store, and Lee went into the store and procured a shotgun, and he and Tucker came out of the store at practically the same time, one armed with a shotgun and the other with a pistol. As they came out of the store, Lanier, who was standing in front with his pistol in his hand, according to some witnesses, and, according to others, with his pistol in its scabbard and his hand on the pistol, moved in a sideway direction toward his car, and reached the rear end thereof, when Lee fired the first shot. Lanier then proceeded to the front end of the car on the opposite side from Lee, and was about even with the driver's seat, but outside the car, when Lee fired the second time, which shot killed Lanier. Lanier fell with the cocked pistol in his hand. Tucker was also shooting at Lanier during the time, but did not strike him.

At the time of the first difficulty between Lanier and Tucker, and after its beginning, Lee came out and requested Tucker to go into the store, and requested Lanier to go on home, that he did not want any trouble with him.

The appellant sought to prove the difficulty which took place in July preceding the killing, which the court refused to permit to be given in evidence. The substance of this proof is that Lee had missed a car and went down the road to where some negroes were having a picnic near where Lanier lived, to look for it, and was talking to some negroes when Lanier heard his voice, asked who

it was, and, on being informed that it was Lee who ran the Log Store, used a vile epithet and said he had better "be running it now," and came out with a pistol in his hand and told Lee that he (Lee) was there to sell whiskey to the negroes, and that he ought to kill him (Lee), using a vile epithet to Lee. This was excluded, and objections and exceptions reserved.

Lee (appellant) also wanted to prove that he did not know the Log Store had the reputation of being a liquor dispensary, or a place where liquors were sold, when he rented same and prior to his opening a store there, and that he had not sold any liquors there, and that he had been raided under the cricumstances already stated, after the conversations with Lanier.

The state introduced several threats made by Lee and Tucker against Lanier, but refused to admit evidence of threats made by Lanier. Lee's evidence was excluded upon the theory that it was too remote.

When the case came on for trial and the jury was being impaneled, certain bailiffs were placed in charge of the jury and attended them at meals, and were not sworn in as required by law until after eight of the jurors had been finally accepted.

It appeared that a motion was made to quash the entire venire because of the fact that these officers had not been sworn, and had attended the jurors alone and had opportunities to converse with them; and also because the officers attending these jurors had contributed to, or promised to contribute to, a fund to employ additional counsel to prosecute this case; and that these officers had spent at least one night with the jurors in the courthouse prior to the motion being made. It appeared also that the sheriff and his deputies had subscribed to the fund to prosecute this case; the sheriff paying fifty dollars and the deputies paying ten dollars each.

On the motion to quash the venire for these reasons, the state introduced the officers who testified that they

did not communicate with the jurors at all, or say anything to them about the case during this time.

The deputies who summoned the special venire were introduced, and testified that they did not discuss the case at any time with the veniremen while discharging their duties.

The testimony for the state, if accepted in full, and the testimony of the appellant, rejected, would be sufcient to sustain the conviction.

There is much evidence for the state tending to show a malicious killing, including statements made immediately after the killing at the very time the transaction took place. We deem it unnecessary to set out in detail the evidence or other statement of facts, but, when we deem it necessary, we will refer to additional facts in passing upon the several points presented.

We prefer to take up the assignments of error in the order in which the matters complained of occur.

The first assignment of error is that the court erred in overruling the motion for a continuance of the case, for the reasons: (1) On account of the public excitement prevailing in the county at the time; and (2) the appellant was denied reasonable time in which to prepare his case for trial.

As stated above, when the killing occurred, the newspaper carried accounts thereof purporting to be in detail, in which the idea was carried that the officer had been killed while making a raid upon the appellant's place of business. Such, of course, was calculated to make the public prejudge the appellant's case, as the idea was carried that the keeper of a blind tiger had killed an officer in resisting the enforcement of law.

But we are of the opinion, after mature consideration, that, while public excitement near the time court is to be held, in a proper case, would be good ground for a continuance, and the appellant would not be required, in all cases, to move for a change of venue, we

are also of the opinion that the showing presented in the case at bar was not sufficient to justify the reversal of the trial court upon this proposition. It is highly important that a trial involving life and death should not be held when the public mind is not in a free, deliberate, and calm mood; but the fact that public opinion is unduly excited to such an extent as would prevent a fair trial must clearly appear before we will reverse the judgment of the trial court. There should have been more than the mere introduction of newspaper accounts to show this.

Although only a short time had elapsed between the killing and the first public report and the time of trial, the public had had time to deliberate upon the matter, and there had been time for such facts to be disseminated among a large part of the people who were available for jury service. If the excitement was such that it was probable a fair trial could not have been had at the time, then the cause should either have been continued or a motion for change of venue should have been made. Ordinarily, the matter is raised by a motion for a change of venue, but it is not necessarily controlled by that proceeding.

The examination of the jurors on their voir dire referred to above does not show unnecessary excitement, or excitement to such extent as would indicate that a fair trial could not be had.

In reference to the second proposition that the appellant was denied a reasonable time in which to prepare his case for trial, the showing is also insufficient to warrant a reversal of the trial judge. While it appears that the witnesses, when approached by the attorney for the appellant, refused to talk to him, and directed him to the report of their testimony taken by the court reporter, and the district attorney refused to permit him to see these statements so taken, and requested that representatives of the state be present when appellant's attorney interviewed the witnesses whose statements he had taken,

the said district attorney, at the same time, expressed a willingness for the witnesses to talk to appellant's attorney. Under the peculiar circumstances of this case, we think it would have been more consonant with fairness to have furnished the appellant's attorney with the statements already made, or to have given him a statement in writing that the witnesses would violate no law or court rule in talking to appellant's attorney. However, such attorney for appellant could have applied to the circuit judge for a statement in writing that the witnesses would not violate the law by talking to attorney for appellant, and such writing would probably have been given if requested.

Furthermore, the showing does not go far enough in setting out that, subsequent to this refusal to appellant's attorney, he had been unable to get any statement from any of the parties involved. Of course, he could have gotten from the appellant, himself, the names of most of the persons present at the time, and, if he could not get information from these persons, and could not learn what their statements would be in court, there would then have been good ground for a continuance of the case for want of preparation. Just what efforts were made by appellant's attorney subsequent to the refusal of the district attorney, and prior to the returning of the indictment, is not clearly set forth. Ordinarily, a memorandum of an attorney is not required to be shown to the opposite attorney, but he must consult the witnesses for himself and learn the facts from them; but he had a right to learn the facts from the witnesses, whether friendly or hostile, and it is not shown that he applied to the circuit judge after the return of the indictment and after the court had jurisdiction of the case, for a direction to the witnesses to tell him what they knew about the case. If he had so applied, and the judge had refused to so instruct the witnesses to talk to him and disclose the facts they knew, then the point might be a serious one. The object of trials is to have a development of the truth,

and both sides should be willing for the truth to prevail, and there is no reason to assume that the witnesses would not talk after being so instructed by the judge.

It is next assigned for error the failure to sustain the motion made by appellant to discharge the jury and enter a mistrial and continue the case after the jury had been impaneled on account of the officers attending the jury not being sworn, and being given an opportunity to talk to the jurors; and also because the sheriff and his deputies had contributed to a fund to hire additional counsel to assist in the prosecution, and such persons contributing, or agreeing to contribute, being appointed bailiffs, without the knowledge of appellant and his attorney of the facts in reference thereto.

This presents a serious question, and it would probably be a safer course to remove every doubt as to fairness and impartiality. However, the state, in answer to the contention, produced the officers attending the jury, and also the officers serving the special venire, all of whom testified positively that there was no communication with the juries about the cause, and this was not disputed.

Had the appellant made a showing of misconduct on the part of the officers by the members of the jury, or any other evidence which would have thrown doubt upon this testimony, we would reverse for this reason; but we do not feel that we would be warranted in reversing the trial judge when the record shows manifestly a desire to get at the bottom of the matter and deal fairly in the case. Counsel made no suggestion to the court of any course that should be pursued after the situation developed, and it appears from the record that it had no actual information, or, at least, it was undisclosed; and we must assume that, if it had, it must have been disclosed under the circumstances.

We think the judgment should not be reversed for this reason.

There was permitted in proving the case against Lee, who was tried separately from Tucker, an expression by Tucker, as stated above, ''Whoopee, drunk again,'' out of the presence of Lee when Lanier was passing Lee's premises, to be considered by the jury. When this testimony was offered and objected to, the trial judge asked the district attorney if he expected to couple it up, and he said that he did, but we think the testimony fails to show that this expression was uttered in the hearing of Lee. Lee testified that he did not hear it the first time it was uttered, being in the store at the time, and not knowing of the difficulty between Tucker and Lanier until some one came in and related that Tucker and Lenier were in a dispute outside. When Lee received this information, he went outside and requested Tucker to go into the store, and requested Lanier to go on home, that he did not want any trouble.

The state seems to have proceeded upon the idea that there was a conspiracy between Tucker and Lee as to the killing, or some other unlawful act in reference to Lanier. It does not appear that Lee was seeking to do Lanier any harm, or that he was taking any part in the difficulty between Tucker and Lanier on the first occasion the very day of the killing.

As to the second outcry Tucker made, viz., ''Whoopee, drunk again,'' just preceding the killing, Lee was in a position to hear this. It was a matter for the jury to say whether he did hear or not. We would not reverse for this alone, but, taken in connection with other matters hereinafter to be referred to, we desire to say that it was error.

It is next contended that the court erred in excluding the testimony offered by the appellant, which testimony dealt with previous difficulties between Lee and Lanier. In the absence of the jury, the appellant testified that Lanier came to his store and charged him with selling liquor, and demanded fifty dollars or some whisky, or, if not, that Lee would be raided, and shortly afterward

Lee's place was raided, but no intoxicating liquor was found; that about one month after this first visit Lanier again approached Lee with the same demand, stating that he would not let Lee stay in Warren county unless he paid this money. Lee again stated that he was selling no liquor, and did not have any money, and was again raided, but Lanier was not in this second raid. Lanier then afterward came to Lee with a similar demand and similar threat, to which appellant would not agree, or pay, and was raided for the third time, but no liquor of any kind was found.

The appellant also testified that on July 4th Morris Tucker took Albert Cockrell's car and went down to where some negroes were having a picnic, and that Lee called one of the negroes, Esau Brown, and heard Lanier ask the negro, "Who is that speaking," and the negro said, "That is Mr. Lee who runs the Log Store," and Lanier said, "The son of a bitch ought to be running it now, he is down here selling whiskey to you niggers," and Lanier then came down to where Lee was, with his pistol in his hand, and said, "You are selling whiskey, and I ought to shoot you;" Lee said, "I am hunting my car, I rung up the sheriff and he told me to get it," and Lanier said, "Damn you and the sheriff too," and about that time another negro was trying to crank his car, and Lanier asked what he had to do with it, and then Lee went away. The sheriff came by a few days after and Lee told him what Lanier had done. All of these remarks were excluded by the court and exceptions were taken.

When the sheriff was on the witness stand, he was asked, in reference to this transaction, whether Lee had appealed to him about Lanier assaulting him on the public road, to which objection was interposed, sustained by the court, and exception taken.

There was also evidence by the state of previous threats made by Lee against Lanier.

Under the peculiar facts of this case, we think it is highly important that the jury understand the previous

relation of the parties, and especially Lanier's attitude toward the appellant. We think there undoubtedly was a previous difficulty, within the legal meaning, when on the Fourth of July Lanier cursed Lee, calling him a "son of a bitch," and came out with his pistol in his hand threatening to kill Lee, and charged him with violation of the law. That certainly indicates an assault and intent, on the part of Lanier, to do violence to Lee and to provoke Lee into a difficulty in order that he (Lanier) might do violence to him, and that the jury would be warranted, if they believed this evidence to be true, in considering Lanier the aggressor in this assault.

In view of the previous threats proven to have been made by Lee against Lanier, we think all the testimony with reference to the demand for money made by Lanier, and the raids made upon Lee, should have been received in this case, so that the full attitude of both Lee and Lanier could be understood by the jury. Without understanding their relations and attitude toward each other, it would be difficult for the jury to rightfully comprehend the case.

In 6 Encyc. of Evidence, p. 744, it is stated: "It is competent for the defendant to show any previous or concurrent facts and circumstances which reasonably tend to increase or intensify a recent provocation. Previous insults and provoking facts, although not of themselves competent, may be admissible after the insult immediately causing the homicide has been proved, as giving character to the last insult, and showing the state of the accused's mind."

In Brown v. State, 88 Miss. 166, 40 So. 737, Judge CALHOON, speaking for the court, discussed the relation of parties and the admission of evidence of previous difficulties, saying: "We said, when this case was before us on a former appeal (85 Miss. 511, 37 So. 957) and we repeat again: 'The record in this case makes it perfectly plain that the justice of the case required, after the state

had been permitted to prove that such difficulty had occurred, that the defendant should be allowed to show the details of the difficulty, in order to demonstrate who was the aggressor in the difficulty resulting in the killing.' It is true that on the trial, the proceedings of which are presented in the present record, the state did not itself prove that the previous difficulty had occurred; but the defendant cannot by such tactics be deprived of his legal rights. The testimony as to the previous recent difficulty between the appellant and the deceased was not made competent alone by the fact that the state had shown affirmatively the fact of the difficulty, but by reason of that principle of law, well settled in this state, that wherever there is doubt, confusion, dispute, or conflict as to the origin of the difficulty, or as to who was the aggressor in the difficulty, which resulted in the death, and when such fact is the pivotal one in the case, testimony of uncommunicated threats, and the nature and character of previous difficulties, wantonly provoked by the deceased, is always admissible, provided the testimony shows some overt act on the part of the deceased at the time of the fatal encounter. As said by this court in the Guice case, 60 Miss. 723: 'It is settled law in this state that proof such as was here offered (i. e., of previous difficulties between appellant and deceased in which deceased had been the aggressor) is always admissible in evidence, where anything that can fairly be construed as an overt act towards the immediate commission of a dangerous assault can be shown to have been done by the person slain, and that, if there be even a doubt as to whether such act was done, evidence such as was here offered should be received.' "

Judge WHITFIELD, in the concurring opinion in the same case, said: "We have said before that the justice of this case requires that these difficulties ought to be admitted in evidence. The reason given by the law books is this: 'That where there have been several difficulties between the same parties, growing out of a cause common

to them all, so that all the difficulties logically form one connected and continuous line of hostile conduct on the part of the deceased towards the slayer, such hostility being manifested in every difficulty by the deceased's having been the aggressor in all such cases, the previous difficulties should be admitted, and their details should be admitted, so far as such details are necessary to explain the motive of the deceased, manifested by such continuous line of hostility on the part of the deceased towards the appellant, resulting in the series of difficulties due to the same cause and the fact that in all he was the aggressor, provided, always, that the evidence shall show some overt act on the part of the deceased at the time of the killing against the appellant.' The thought is— the philosophy of the thing is—that in all cases of that character, each difficulty resulting from the same cause has been inspired by the same motive, shows the deceased to be always the aggressor, and thus presents a continuous system or series of difficulties practically amounting to a continuous assailing of the appellant by the deceased whenever they meet, due to the same motive throughout. This is the principle of the Guice case, 60 Miss. 723, to which special attention is directed."

We think also the condition of the appellant's mind, at the time of the fatal shooting is important in the case at bar in determining whether the killing was malicious and willful, or with malice aforethought, or whether justifiable, and, if not justifiable, was done under a mistaken belief, honestly entertained, as bearing on the question of possible manslaughter. If the previous conduct of the deceased was, as testified to by Lee, hostile, it would constitute a situation highly provocative in its nature, and such conduct, on repetition, was calculated to highly exasperate and inflame the mind of an ordinarily reasonable man. It is well known that there is a marked difference between the effect of an act when accompanied by previous provocation and one not so ac-

companied. Men, at best, are fallible and frail beings, and, where there is a persistent effort to provoke a difficulty by one person against another, the mind reacts with violence, although it is the mind of an ordinarily prudent and reasonable man.

Under our statutes, murder is the deliberate or willful killing of a human being without legal excuse, with malice aforethought. There are certain statutory killings excused or justifiable under the law, and all other killings constitute manslaughter.

While the state's evidence, as stated above, tended to show a killing that would amount to murder, if such evidence is accepted in full, still, looking at the transaction in the light of the proffered testimony, and accepting this testimony for the purpose of passing upon this question as being true, and we must assume it was true, in weighing its effect, we think it was highly probable that the killing was manslaughter only. With all the evidence mentioned coupled with that admitted, and weighed carefully, deliberately, and impartially, we think the jury would have been warranted in believing that the killing was not a deliberate, malicious, and willful killing, but one that was the result of an accumulation of a series of provocative acts on the part of the deceased toward the appellant. We do not mean, of course, to be understood as accepting the appellant's testimony as against the state's witnesses. That is the function of the jury; and the jury can weigh the testimony in the light of all the facts; the probability of the matter—and then reach a correct conclusion; but we think the jury should have a proper background in trying the case with the evidence at the very moment of the killing. It cannot be reached in any other light.

It seems from the record that the previous attitude of the appellant, Lee, was gotten at, in the trial of the case in the court below, without the benefit of a similar attitude and conduct on the part of Lanier, previous to the difficulty. With Lanier's attitude in evidence, the jury

might have returned a different verdict, and might not have returned a verdict imposing the extreme penalty of the law.

We think that, while the details were not all admissible, the statements Lanier made to Lee, demanding money or liquor as a condition of doing business there undisturbed, should be confined to the mere fact of a threat offered, and the raids made, and the evidence of the appellant that no liquor was being sold or found on his premises.

This is especially important in the present case, owing to the newspaper accounts at the time of the killing that the officer had been killed in a raid in search of intoxicating liquors. Lee should have been permitted to get before the jury the fact, if it was a fact, that he knew nothing of the reputation of the Log Store before renting same, and that these searches were the result of Lanier's activity and the reputation of the building, so that the jury could understand better who was the probable aggressor at the time of the killing, and whether the appellant was the aggressor, or if Lanier was, and circumstances which might have mitigated the character of the killing.

Taking all the assignments previously considered, most of which would not constitute reversible error if standing alone, they indicate the disadvantages the appellant was under in standing his trial. It may be, in certain cases, that there are many things for which the court would not reverse alone, which, taken together, constitute such a pressing obstruction to a fair trial that the court would not say, with confidence, that the trial had been fair; and, wherever such is the case, and this is one of that character, the errors cannot be lightly passed over, especially serious errors, for which a new trial should be granted.

We have examined the instructions given for the state complained of, and do not find any reversible error in

them. The phraseology of some of them is objectionable, but there is no reversible error in any of them.

The instructions alleged to have been refused the appellant were not presented in such way as we can take notice of them. There are two methods of marking instructions; one to have them marked filed, and given or refused, by the clerk, when they will become a part of the record by operation of law; and the other is to take a bill of exceptions signed by the trial judge, and, if he will not sign, then by the attorneys, certifying that instructions were requested and refused or given, as the case may be. Neither of these methods were pursued here, but there was a mere affidavit on the information and belief of the stenographer to whom appellant's attorney dictated same and an affidavit by the attorney that to the best of his information and belief such instructions were presented to the trial judge. If they were a part of the record, they should have been incorporated by the clerk, but, unless made a part of the record in the manner indicated, they cannot be considered by the court on appeal.

For the errors indicated, the judgment of the court below will be reversed, and the cause remanded for a new trial.

Reversed and remanded.

**Smith, C. J.**, and **Cook, J.**, dissent.