## LEE v. STATE.

(Division B.   May 10, 1937.)

[174 So. 85.   No. 32711.]

Patterson & Patterson, of Calhoun City, and **Creek-more, Creekmore & Capers**, of Jackson, for appellant.

**W. D. Conn, Jr.,** Assistant Attorney-General, for the state.

Argued orally by **H. H. Creekmore,** for appellant, and by **W. D. Conn, Jr.,** for the State.

**Ethridge, P. J.,** delivered the opinion of the court.

Appellant, J. L. Lee, jointly with John Lantrip, was indicted in the circuit court of Calhoun county on a charge of murdering one Ellis Sledge. Upon a separate trial, Lee was convicted and sentenced to serve a life term in the State Penitentiary, from which he prosecutes this appeal.

The testimony is voluminous, and will not be set out in detail. The killing of Ellis Sledge by J. L. Lee occurred at night on September 13, 1935, about 2:30 or 3 A. M. The testimony is conflicting, that in support of the State's theory being to the effect that a number of witnesses heard a series of shots in rapid succession near the Lee home in the town of Bruce, and one witness, Prentiss Kincaid, claimed to have been an eyewitness, testified that he was traveling along the highway from Calhoun City through Bruce, and saw two men shooting into a car occupied by Ellis Sledge; that he recognized Lee, but did not know the other party. This witness was contradicted both by statements made outside the court, and by the impeachment of his character for truth and veracity.

The testimony for the appellant is substantially as follows: At about 2:30 or 3 at night two shots were fired

from a shotgun into the home of J. L. Lee, one striking near a window in a room occupied that night by John Lantrip. The appellant, his wife, daughter, and another lady, were occupying rooms back of the room shot into. Immediately upon the shooting, Lee arose, took his pistol and went out in front, saw a car proceeding north which he recognized, and which stopped in front of Sledge's home, which was near Lee's home. Lee's son and daughter-in-law lived nearby; heard the shooting; got up and saw this car proceeding north and saw it stop at the home of Sledge. Lee then went into his home, put on his clothes, loaded his gun with buckshot, and took it and a flashlight and went out into the road, and asked his son to keep an eye on the car then in front of Sledge's home. Presently the car was turned and came back South. In the meantime, Lee had crossed the highway in front of his house, and as the car approached he flagged it with his flash-light, but instead of stopping, the car was speeded up, and Lee called out, "Stop Sledge," and as the car was not stopped, Lee fired into the casing on the wheel puncturing it and causing the car to stop. Thereupon, Lee went to the right-hand side of the car, and saw Sledge therein armed with a shotgun, which he drew, and Lee pushed this shotgun to one side and it was discharged, and Lee fired several shots into Sledge's body. Lee, who was a marshall of the town of Bruce, then sent for the mayor, who came to the scene, as did several other parties, and an ambulance was sent for to take Sledge to a hospital, but he died before reaching it. The mayor took charge and refused to let the car be moved. It was examined the following morning, and it was shown that the casing on the rear wheel was punctured, and there were bullet holes in the front of the car, just below the windshield.

A physician sent for immediately after the shooting, testified that there were wounds on deceased's arm and breast, and also in his side just above his hip. There

was also testimony to the effect that the forehead of the deceased was bruised, but the undertaker said there were no wounds nor bruises on his head.

The lady who was in Lee's home, Mrs. Ellender, was offered as a witness, but her testimony was excluded. It was to the effect that she heard the shots fired into Lee's home; that Lee ran out with his pistol, and afterwards returned to the house, put on his clothes, took his flash-light and gun and went out again; that she heard Lee call to Sledge to stop, and heard the shots, but she did not see any of the shooting.

The appellant offered Drew Cannon as a witness, and he testified that prior to the killing which occurred in September, 1935, he and Lee served a search warrant on Sledge, and that during the progress of the search he had a pump gun in his hand which the witness took from him, and that Sledge, with a vile epithet, said that, "if Lon Lee pokes his head around here I intend to kill him—I intend to shoot his head off." On objection, this statement was excluded as being too remote, and because it was not communicated to the appellant.

Appellant then offered Jess Collins, who testified that in the spring of 1935, he went to Sledge with a purpose of trying to sell him a ham, and heard him say that if he could get Lee killed for $100 he would pay $25 on it, This testimony was excluded by the court on the State's objection that there was no threat on the part of the deceased and was too remote.

Another witness testified that he had a talk with Sledge at his café in February or March, 1935, and that Sledge asked this witness, since he had been boosting for the new judge, if he would go to court and try to get the judge to hold up Sledge's fine. This witness told Sledge that he would be glad to do so, but that Morris was the man to do that, and that Sledge then said, "He stuck me once and I have no confidence in him. . . . If I can get it held up for six months they may be prosecuting me for killing Lon Lee, and will not be prosecuting

me for having a liquor joint." This witness said that he later told appellant what Sledge had said. This testimony was given out of the hearing of the jury, and on objection, the court held that only the threat was competent.

The appellant sought to impeach the witness, Kincaid, by the testimony of R. A. Stafford, a deputy sheriff, who said he lived 15 miles northwest of Pontotoc; that he knew, and had known for about eight years, the witness, Prentiss Kincaid, and that his reputation for truth and veracity was bad, and that he would not believe him on oath. On cross-examination he testified that it had been two or three months since he had heard Kincaid's reputation for truth and veracity discussed. This testimony was, by the court, ruled out, because the witness did not know Kincaid's reputation in the community to which he went after leaving the community where he was known by Stafford.

The testimony as to the witness, Kincaid, is vital, he having claimed to be an eyewitness to the killing, and if the impeaching evidence was believed by the jury, there might have been a different verdict. We think the court below should have permitted this impeaching evidence to go to the jury, although the witness was unable to say what Kincaid's reputation was in the community into which he had moved, some six months before. In Norwood & Butterfield Co. v. Andrews, 71 Miss. 641, 16 So. 262, it was held that it is competent to show the bad character of a witness for truth and veracity in a neighborhood where he had lived for many years, and from which he had moved two years before. That was a much longer period than the one in the case at bar, as Kincaid, as stated, had been away from the community in which he had lived for some time only about six months.

For the State, the court below granted the following instruction: "The court charges the jury, for the State, that even though you may believe that the deceased shot

into the house of the defendant some few minutes before the fatal shooting, the court now says to you that that of itself is no justification or authority for the defendant, even though he was an officer of the law, to shoot at the car or casing of the deceased as it passed the defendant, or to kill deceased, and that when the defendant so shot at the car or casing, he was then and there doing an unlawful act, although he only intended to bring the car to a halt and arrest the deceased.'' The giving of this instruction is assigned as error.

The evidence for the defendant, if believed by the jury, is sufficient to warrant a finding that Sledge shot into Lee's home twice, at night, at a time when the house was occupied, and that it was competent to show the state of Sledge's mind and his probable intent in thus shooting into Lee's house. It is difficult to see upon what theory the court held, under the circumstances disclosed by the record, as it did in this case. If the shot fired into the room where Lantrip was sleeping had killed him, it could hardly be doubted that it would constitute murder. Section 985, Code 1930, defines murder as the killing of a human being without the authority of law, when done ''in the commission of an act eminently dangerous to others, and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual.''

Taking the fact that Sledge lived near Lee, knew the situation of the house and that it was occupied, his firing into the house was done in the commission of an act which evinced a reckless disregard for human life. Under section 793, Code 1930, it is provided that every person who shall design and endeavor to commit a crime and does any overt act towards its commission, but fails, shall on conviction, where no provision is made by law, be punished as follows: If the offense be capital, by imprisonment not exceeding ten years; if the offense attempted to be committed be punishable by imprisonment, or by fine and imprisonment, then the attempt to

commit such crime shall be punishable for a period, or a fine, not greater than is prescribed for the actual commission of the attempted offense. It thus clearly appears that there was a high degree of probability that Sledge fired into Lee's house with a reckless disregard of human life and with the intent to injure some person therein.

Under section 1224, Code 1930, arrests for crimes may be made by the sheriff, his deputy, or by any constable or conservator of the peace in his county, or by any marshal or policeman of a city, town, or village, or by private persons. Section 1227 provides that such officers may arrest without warrants, for indictable offenses or breaches of the peace, or where a felony has been committed, and such officer has reasonable ground to suspect some person of having committed it, he may arrest such person. The evidence shows that the gun of the deceased had one empty and one loaded shell, and that there were two empty shells of the same caliber as this gun on the seat of the car.

These facts, if believed by the jury, would certainly constitute probable cause for believing that the deceased committed a felony such as would warrant the appellant in making an arrest without a warrant, consequently it was error for the court to instruct the jury that the appellant was doing an unlawful act when he fired into the car occupied by Sledge. Certainly any person or officer would reasonably believe that a person who fired into a house, where persons were sleeping, at night, was committing a felony and intended to kill somebody. As stated, the intent of Sledge's mind was a material part of the evidence in this case. Under the circumstances of this case, could a reasonable man believe other than that the deceased's mind was fatally bent on mischief?

In Stephens "Digest of the Law of Evidence," Fourth Edition, as reported in American and English Encyc. of Law, volume 7, page 42, et seq., it is said that "Evidence may be given in any proceeding of any fact in issue,

and of any fact relevant to any fact in issue, unless it is hereinafter declared to be irrelevant, etc. . . . Where there is a question whether any act was done by any person, the following facts are deemed to be relevant, that is to say, Any fact which supplies a motive for such an act, or which constitutes preparation for it.''

It appears from the evidence that, when the premises of Sledge were searched in December, intoxicating liquor was found, for which he had been convicted in a justice of the peace court and had appealed to the circuit court. As stated, it was attempted to be shown that he was trying to arrange to have his prosecution deferred, and stated that he would be tried, if his prosecution was deferred, for killing Lee, and not for having intoxicating liquor in possession. This certainly indicated a hostile state of mind; furnished a motive on the part of Sledge to kill Lee, and was relevant to the issue. In Lee v. State, 160 Miss. 618, 134 So. 185, 191, this court, quoting from 6 Encyc. of Evidence, page 744, said that ''It is competent for the defendant to show any previous or concurrent facts and circumstances which reasonably tend to increase or intensify a recent provocation. Previous insults and provoking facts, although not of themselves competent, may be admissible after the insult immediately causing the homicide has been proved, as giving character to the last insult, and showing the state of the accused's mind.''

See further as illustrating these principles, the cases of Brown v. State, 88 Miss. 166, 40 So. 737; Marley v. State, 109 Miss. 717, 69 So. 210, and McCormick v. State, 159 Miss. 610, 132 So. 757. See, also, 6 Encyc. Evidence, pp. 765, 766.

We think the court below erred in the respects indicated, and that justice requires that a new trial be had. Of course, the proof for the State, if believed by the jury, is sufficient to convict, but we are satisfied that the

appellant's rights were violated, and that on a new trial a different verdict may be reached.

Reversed and remanded.