## BEAUCHAMP V. STATE.

[91 South. 202  In Banc. No. 22402.]

1. HOMICIDE.  *Question by deceased as to why defendant shot him, and deceased's statement that he never harmed any one, held admissible as part of dying declaration.*

   While making a dying declaration the deceased, who was killed by the defendant on trial for homicide, asked the person to whom the declaration was being made why the defendant shot him, and stated that he never harmed the defendant, never harmed any one; this question and statement are not the expression of a mere opinion by the deceased, but are, in effect, a statement of fact that the defendant shot the deceased for nothing, and are admissible in evidence as a part of the dying declaration.

2. HOMICIDE.  *Deceased's statement several months before his death, that he expected to get well, held not admissible to impeach his subsequent dying declaration.*

   A statement by the deceased on a trial for homicide, made while in the hospital and several months before his death, that he expected to get well and return home, is not admissible in evidence to impeach the credibility of a dying declaration, made by the deceased some months thereafter.

3. HOMICIDE.  *Where evidence conflicts as to who was aggressor, deceased's uncommunicated threat against defendant is admissible.*

   Where the evidence on a trial for homicide as to whether the deceased or the defendant was the aggressor is conflicting, a threat by the deceased to use personal violence against, though not communicated to, the defendant, is admissible in evidence.

4. CRIMINAL LAW.  *Circumstances under which deceased threatened defendant are competent to explain threat.*

   In a prosecution for homicide, the circumstances under which a threat admissible in evidence was made are competent to explain its meaning and significance.

ANDERSON and ETHRIDGE, JJ., dissenting.

APPEAL from circuit court of Monroe county.

HON. C. P. LONG, Judge.

Dr. I. W. Beauchamp was convicted of manslaughter, and he appeals. Reversed and remanded.

*Leftwich & Tubb* and *L. W. Houston, Sr. & Jr.,* for appellant.

Self-defense. General Threats. Evidence. Instructions. Although the evidence for the state may show a case of murder, if there is testimony to the effect that deceased was killed while trying to draw a pistol, when an effort was made by accused to arrest him, the court will not weigh the evidence, but should submit to the jury instructions on the right of selfdefense and admit evidence of threats made by deceased to kill anyone attempting to arrest him, leaving the jury, on the whole case to accept or reject defendant's theory. *Harris* v. *State,* 72 Miss. 99, cited by 21 Cyc. 965.

Homicide. Evidence of Threat Admissible. General. In a prosecution for murder of a constable, testimony that defendant, a deserter from the army, several weeks before the difficulty, uttered threats against any officer who should undertake to arrest him, held admissible. *Boatwright* v. *State,* 83 So. (Jan. 31, 1920) 311, 120 Miss. 883 and 896, citing *Harris* v. *State, supra.*

Admissibility of Uncommunicated Threats by Decedent. It was prejudicial error to exclude testimony on a trial for homicide of uncommunicated threats by decedent against accused where accused claimed to have acted in self-defense, since such threats indicated the feeling of deceased toward accused. *Leverett* v. *State,* 112 Miss. 396 & 406 (73 So. 273) citing *Harris* v. *State,* 72 Miss. 99, 406.

Uncommunicated Threats Admissible Where There was Doubt, or Conflict as to Who Was the Aggressor, or Where They Throw Light on the Significance of the Acts of the Deceased. *Sinclair* v. *State,* 87 Miss. 330; *Echols* v. *State,* 99 Miss. 683; *Brown* v. *State,* 88 Miss. 171; *Johnson* v. *State,* 66 Miss. 189; *Bell* v. *State,* 66 Miss. 192; *Prue* v. *State,* 73 Miss. 838. Reversible error to exclude, *Mott* v. *State,* 86 Miss. 514.

Conditional Threats of Deceased Admissible Where the Condition of the Threats had Materialized. Entire Con-

versation in Which Threats Were Made are Admissible. 21 Cyc., Note p. 964, citing *Adams* v. *State* (Tex. 1904), 84 S. W. 231; *Owens* v. *State*, 80 Miss. 510.

All of the Circumstances Under Which Threats Made are Admissible. Defendant has the right to show all of the circumstances which go to show the character of the threat, the intention with which they were made, and the grounds of fear on which defendant acted, as bearing upon the difficulty whether the grounds for fearing death or serious bodily harm were serious. 21 Cyc., Note p. 964, citing *Poole* v. *State*, 45 Tex. Cr. 348, 76 S. W. 565; *Russell* v. *State*, 11 Tex. App. 388.

## III.

The Dying Declaration. The court went far afield, and permitted this witness to tell of statements made to his mother by deceased long after the shooting, conclusions which he had then drawn some months thereafter. *Lipscomb* v. *State*, 75 Miss. 559; *Guest* v. *State*, 96 Miss. 872; *Jones* v. *State*, 79 Miss. 309; *House* v. *State*, 94 Miss. 107.

It is hardly necessary to cite authorities to show that this character of testimony is at best mere hearsay and intrinsically weaker than if the declarant had been present at the time in court and sworn and subject to cross-examination. *Lambert* v. *State*, 23 Miss. 322.

Certainly Miss Hulsey's testimony was competent to go to the jury and let them judge, not as to the admissibility of it, but as to the weight and credibility to be given the dying declaration under all of the circumstances. See authorities cited in 2 Bobbs & Merrill Digest, p. 596 and 597; citing among others: For the purpose of showing deceased to have been the aggressor, and the killing to have been in self-defense, defendant can introduce evidence tending to show deceased entertained hostile feelings toward him, and that deceased had evinced by acts or conduct hostility to him. Evidence of language used by de-

ceased conveying and giving color to his hatred or unfriendliness towards defendant, are admissible. 21 Cyc. 962 and Note 28, citing Ind. & Indiana Terr. & Tex. Cases; *Clark* v. *State,* 123 Miss. 147, 156, 157; Forest County, Decided March 9, 1920.

Defendant Need not Be Named in Threat. Sufficient if Included in Scope.

It is not necessary that defendant should have been named in the threat, it being sufficient if the circumstances show that he was the person against whom it was directed (Sparks, Ky., 20 S. W. 167; *Young* v. *Com,* 42 S. W. 1141, Ky.) and evidence of threats against a class to which defendant belongs is admissible, it being for the jury to determine whether they were made against defendant. (*State* v. *Hopper,* 44 S. W. 272), threats against Hopper Boys; *Mayfield* v. *State,* 11 N. E. 618 (Ind.); *Harris* v. *State,* 72 Miss. 99, 37 Pac. 53, Ore. See 21 Cyc. page 965.

If Any of Colloquy Admissible, it Should be Admitted as a whole. In a prosecution for homicide, it was error to exclude testimony that the mother of deceased had told deceased that he had brought the trouble on himself, and that if he had listened to her, he would not have been involved therein; and to admit the deceased's answer, wherein he said: "Yes, if my gun had fired, I would have killed him, for if any of the colloquy was admissible it should have been admitted as a whole. 1 Bobbs & Merrill's Miss. Digest Criminal Law, 711, sec. 415, citing *Flowers* v. *State,* 85 Miss. 591, 597-8; *Nelms* v. *State,* 13 Smedes & Marshall 500; *Lambert* v. *State,* 23 Miss. 322; *Gambril* v. *State,* 92 Miss. 728; *Marley* v. *State,* 109 Miss. 717.

The rule is very well stated indeed in the Gambrill case, to the effect that the dying declaration of a party is simply a part of the evidence, and is not regarded in law as more sacred than the testimony of a witness. It is subject to discredit and impeachment by any competent testimony which impairs its value.

Also in the Nelms case that it is for the court to determine upon the competency of such evidence, and for the

jury to adjudge its credibility, and to that end it is important that all the deceased said should be before the jury.

*Geo. T. Mitchell,* for the state.

After the court had excluded the testimony of the witness Grady as a whole, counsel for defendant then offered specific portions of his testimony that portion pertaining to threats against Dr. Beauchamp by Frank Frash and now say that the action of the court in excluding that specific portion constitutes reversible error. I submit that the court below was correct in excluding all the testimony and rest my contention upon the case of *Hinson* v. *State,* 66 Miss. 532.

Counsel for appellant complain that in the admission of the dying declaration of deceased, as testified to by Mrs. Frash the declaration was not restricted to the alleged facts and circumstances surrounding the homicide, but that Mrs. Frash was permitted to testify to conclusions and matters of opinion and conjecture of deceased. Considerable authority has been cited to show that the dying declaration of deceased must be confined to the facts surrounding the homicide. I concede most readily this to be the law, but I insist that the dying declaration introduced in this case contains simply a recital of the facts of the homicide as detailed to Mrs. Frash by her dying son. He goes into detail about the matter and gives his movement up to the time of the firing of the fatal shot. These declarations were made by him time and time again during the five long months that he suffered. I earnestly insist that in the admission of the dying declaration, and all parts of same, there was not only no reversible error, but no error at all.

Counsel for appellant complain next that it was reversible error to exclude the testimony of Miss Emma Hulsey, a witness offered in behalf of appellant. This witness was not offered before the court while he was passing up-

on the admissibility of the dying declaration, counsel frankly admitting to the court that they did not deny the admissibility and competency of the dying declaration, but that they might introduce some testimony attacking its credibility. They did afterwards introduce Miss Hulsey before the jury. She testified that she went from Amory to the Infirmary at Birmingham with Frank Frash on June 5th and that as she was leaving him he told her that he expected to get well and come back to Amory and come to see her and them. The court below took the position that this testimony was not competent to go before the jury. For the purpose of this argument, I am going to concede that the jury has a right to hear testimony which affects the weight or credibility of a dying declaration which has theretofore been held admissible by the court. But, even if that be the law, appellant certainly has no cause for complaint by reason of the exclusion of the testimony of Miss Hulsey. The only purpose in introducing Miss Hulsey was to show that on June 5th when she left him in Birmingham, he had some hope of recovery and that therefore the dying declaration was not competent or admissible at all.

The last assignment of error is that while the closing argument for the state was being delivered to the jury, the mother of deceased began to sob and cry out in the presence and hearing of the jury. The court immediately did all he could do and had the poor woman removed from the courtroom. Counsel insists that the court should have gone further and instructed the jury that they should not be influenced by this outburst of feeling on the part of the mother. We must surely give the jury credit for having some common sense. We are warranted in supposing the jury knew that the sobs of the mother were not evidence in the case. That they were sworn to be controlled absolutely by the law and testimony, and we must give them credit for basing their verdict upon the law and the testimony alone. If the sobs of the mother had had any influence with the jury, they most assuredly would have

made no recommendation to the court for mercy for appellant.

The weeping of the mother is a matter beyond the control of the court, except to remove her from the courtroom which the court very promptly did. No one can control the outburst of a broken heart, and the recalling to her mind of the facts and circumstances of that terrible tragedy, coupled with the long and continued suffering of her son, was too much for her broken spirit and no one can blame her for relieving her suffering with tears. I earnestly submit that there is nothing in this ground of complaint.

This brief is much longer than I intended it should be at the outset, but there are so many assignments of error that I feel that I have curtailed it all I could. I respectfully submit that appellant had a fair and impartial trial in the court below, that no reversible error was committed in the trial.

We respectfully submit that the judgment of the lower court should be affirmed.

SMITH, C. J., delivered the opinion of the court.

The appellant was indicted for murder, and convicted of manslaughter. The deceased, Frank Frash, was shot by the appellant on the night of May 28, 1919, with a pistol, the bullet entering the neck from the front and lodging in the spinal column at the base of the brain, resulting in paralysis from his arms down, and from which he died on October 24th following.

Jim Frash, a brother of the deceased, was an employee of the Frisco Railroad, working in the yards thereof at Amory in the roundhouse at night, and on the night in question the deceased's mother had sent him to the roundhouse for the purpose of bringing his brother home, for the reason that she was afraid of trouble arising between him and the appellant, as will hereafter more fully appear. The killing occurred a short distance from the roundhouse.

The only persons present at the time were the deceased, the appellant, and one Roy Mason, who was not introduced as a witness.

The mother of the deceased testified: That he told her, several times after he was shot, the last time being three days before his death, that he failed to find his brother in the roundhouse, and went out into the yard, thinking that he might find him on an engine; but, failing to do so, he started back into the roundhouse, when the appellant and Roy Mason stepped out from behind a railroad car, and the appellant said, "Stop, boy!" and shot him. That he wanted to tell the appellant that he had not come there for any trouble, but he did not give him time to talk. That both the appellant and Roy Mason were armed, and that he (the deceased) had a pistol, but it was in his pocket. That the deceased also several times said to her: "Mama, why did Dr. Beauchamp shoot me? I never harmed Dr. Beauchamp. I never harmed any one." No objection was made to this declaration, other than to the last clause thereof; that is: "Mama, why did Dr. Beauchamp shoot me? I never harmed Dr. Beauchamp. I never harmed any one"—the ground of this objection being that it is the statement of a mere opinion, and not of a fact.

Only one shot was fired, and immediately thereafter the appellant and Roy Mason left the scene. Several parties who heard the shot went to the scene of the difficulty, and found the deceased lying on his face, unable to move, and they picked him up and carried him to the roundhouse, from which he was removed to an infirmary in Amory, and later from there to an infirmary in Birmingham, Ala., where he died.

The appellant testified: That he, Roy Mason, and several others met in a park just across the railroad from the railroad roundhouse on the night in question, and while they were there the deceased and another passed going toward the deceased's home. That they, the appellant and his companions, decided to go to the roundhouse and try to induce Jim Frash, the deceased's brother, to leave town,

as he had promised, because of an insult they claimed he had given several ladies some time prior thereto, and that it was their intention not to use any violence against him if he declined to leave, but to prosecute him criminally. That when they arrived near the roundhouse it was agreed that trouble with Jim Frash was less likely to arise if the appellant and Roy Mason remained behind. That consequently they did not go in the roundhouse, but walked up the track a short distance to the foreman's office, and stood near it and by several coal cars that were on one of the railroad tracks. That the railroad yard, particularly in that vicinity, was well lighted. That while they were standing near this office they saw the deceased with two companions come out of the roundhouse, go into the foreman's office, and that he immediately came back out of the office and re-entered the roundhouse about forty-five or fifty feet from where the appellant and Mason were standing. What then occurred can best be told in the appellant's own language:

"Q. Now, what did you then do when you saw this young man go back into the roundhouse? A. I turned south and walked the length of the car; there were two cars separated by about six or eight feet, I suppose, and I passed in between these two cars going towards the roundhouse so I could see in the roundhouse window to see which direction he would go. I knew that if I knew where he was I could keep out of his way. That was my idea; wanting to see where he was, so I could keep out of his way.

"Q. Well, as you passed between these cars where you could get a view of the roundhouse and so on, tell what occurred. A. Just as I stepped from between the cars, from in between the cars, Frank Frash was in eight or ten feet of me, coming towards me from the roundhouse door. As soon as he saw me he stopped and put his right hand in his right hip pocket, attempted to pull his gun, and I spoke to him, says, 'Hello, Frash,' and he still attempted to get his gun out—seemed to be having trouble, and he put his left hand on his pocket, like this (illustrating) to hold it,

and I spoke to him again: 'Don't do that! Don't do that!' and he says, 'I'll get you!' and, after he pulled his gun out I shot.

"Q. What was the position of his gun in his hand at the time you fired? A. Well he had his hand up about like this (illustrating). . . .

"Q. Tell the jury, Doctor, why you felt it necessary to shoot on that occasion, if you did feel that it was necessary. A. Well, the boy told me he was going to get me, and pulled his gun out and had it in his hand, and I believed that he was going to shoot me, and I shot him in self-defense."

The appellant offered, but was not permitted, to prove by the mayor of the town of Amory: That on the morning of the day of the killing the witness told the deceased that on the day before the deceased's brother Jim had been accused by the appellant and Roy Mason in the witness' office with having insulted several ladies some time prior thereto, and that the appellant had there slapped Jim, who thereafter, at the mayor's suggestion, had agreed to leave town temporarily, and that he (the mayor) thought that was the best course for Jim to pursue. That the appellant then said:

"Jim's got a job. He is not going to leave here. He is going to work to-night at ten o'clock. And the first one of them God damn son of a bitches comes fooling around there, I am going to leave him, and you will find him around there."

When the witness told the deceased that the appellant had slapped his brother, the deceased said:

"That God damn red-headed son of a bitch won't slap me."

This conversation was not communicated to the appellant. On the afternoon of the day of the killing a railroad employee whose duty it was to call the employees for work in the roundhouse, while looking for Jim Frash, saw the deceased in a drug store, and asked him if he knew whether Jim would work that night, to which the deceased replied:

"By God, he had better work."

One of the railroad employees had the following conversation with the deceased in the roundhouse just a few minutes before the killing:

"A.  Well, I told Frank that I had been informed that his brother had gone home, and if I was him I'd go on home and not have any trouble; that his brother wouldn't be hurt.  He remarked and said that he was going to kill that red-headed son of a bitch for what he did to his brother in the mayor's office.

"Q.  And what did he say, if anything, or do, with reference to any directions?  A.  Well, he said he was right down there, and pointed in the direction of where he was afterwards shot.

"Q.  Pointed in the direction of where he was afterwards shot?  A.  Yes, sir."

The appellant has red hair, and was the only one in his party on the occasion in question whose hair is of that color.  This witness was impeached by proof that he had said that he did not know anything about the case.

After the dying declaration had been admitted and while the appellant was introducing evidence on the main issue he offered, but was not permitted, to prove that on June 5th, before the deceased died in October, he had said that he expected to get well and go back to Amory.

One of the instructions to the jury granted at the request of the state defined the crime of manslaughter, and charged the jury that, if they believed beyond a reasonable doubt that the appellant was guilty of that crime, to return a verdict therefor.  The principal contention of the appellant is that the evidence will not sustain a conviction for manslaughter, for the reason that it appears therefrom that he is either innocent or guilty of murder, and that consequently the court below, under the rule announced in *Rester* v. *State,* 110 Miss. 689, 70 So. 881, should not have charged the jury on the law of manslaughter; that for this reason the judgment of the court should be reversed, and since the appellant has been acquitted of murder, and can-

not on the evidence be convicted of manslaughter, he should be discharged. On this question the judges are equally divided, Judges COOK, SYKES, and SMITH being of the opinion that the case falls within and is controlled by the Rester Case, and Judges ANDERSON, ETHRIDGE, and HOLDEN being of the opinion that it can be differentiated from, and is therefore not controlled by, that case.

The question which the deceased asked his mother, "Mama, why did Dr. Beauchamp shoot me?" followed by the statement: "I never harmed Dr. Beauchamp. I never harmed any one"—is not merely the expression of an opinion, but is in effect a statement of fact by the deceased that Mr. Beauchamp shot him for nothing, and was therefore properly admitted in evidence. *Jackson* v. *State,* 94 Miss. 83, 47 So. 502; *House* v. *State,* 94 Miss. 107, 48 So. 3, 21 L. R. A. (N. S.) 840.

The statement made by the deceased that he expected to return to Amory and visit his friends was offered on the theory, not that it would affect the admissibility of the dying declaration, but that it might be considered by the jury in determining its credibility. But how it could affect the credibility of a declaration, made months thereafter, is not apparent. Its exclusion therefore was not error.

The statement made by the deceased to the mayor of Amory that, "And the first one of them God dam son of a bitches comes fooling around there, I am going to leave him, and you will find him around there," was a threat to use personal violence against the appellant and any of his associates who should attempt to interfere with his brother's continuing to work at his job, and should have been admitted in evidence. If this threat was made by the deceased, which fact was for the jury to determine, it would have tended to corroborate the claim of the appellant that the deceased, and not he, was the aggressor in the difficulty in which the deceased was killed. In addition to the threat so much of what the witness told the deceased that induced him to make the threat should also have been admitted in order that the significance of the words used by the de-

ceased might be clearly understood. *Clark* v. *State,* 123 Miss. 147, 85 So. 188. This would not have given rise to a collateral inquiry as to what occurred in the office of the witness, for what may have in fact there occurred would not be here material, for the significance of the threat made by the deceased must be determined by what the witness told the deceased had there occurred.

For the error in the exclusion of this evidence the judgment of the court below will be reversed, and the cause remanded.

Judges ANDERSON and ETHRIDGE are of the opinion that the error in the exclusion of this evidence was not prejudicial to the defendant, and consequently that the judgment of the court below should be affirmed.

*Reversed and remanded.*