PEARSON *v.* STATE

No. 43651 November 15, 1965 179 So. 2d 792

*Robertshaw & Merideth,* Greenville, for appellant.

*R. Hugo Newcomb, Sr.,* Asst. Atty. Gen., Jackson, for appellee.

LEE, C. J.

R. B. Pearson was indicted by the grand jury of Washington County for the murder of one Fred Johnson Ellis. The trial jury found him guilty of manslaughter and he was sentenced to the penitentiary for eight years. From that judgment, he appealed.

Before 6:00 o'clock A.M. on Sunday, June 21, 1964, Ellis was shot to death on the premises of Rose Oil Company, where he worked as an employee. Otis R. Wilson, who worked at the same place, roomed across the street from the station, about 50 or 60 feet away. About 5:40 that morning he heard a gun shot and a man hollering from the station. He jumped up, opened the door, and saw Ellis lying on the ground in front of two gas pumps on the north end of the station. A man was standing over him with a double barreled shotgun pointed at his head, and was telling him "If you don't hush, I will shoot you again." Wilson called his landlady, Mrs. Martin, and asked her to get a doctor, an

ambulance, and the law. By the time he dressed and got over to the station, Pearson was walking toward his truck, which was parked in the back of the lot. He observed a 24 quart oil container, with the cans lying around, and oil running out of the shot pierced cans and from under the body of the wounded man. Ellis was lying on his stomach hollering for somebody to help him. A number of pictures of the scene were introduced in evidence, together with the shotgun, the death weapon.

Mrs. Christine Martin, in whose home Wilson roomed, on the early morning in question, heard a gun shot. She raised the curtain and looked out naturally in the direction of the oil station because it was so close. She then went out on the porch and saw the accused, R. B. Pearson. He was close to the oil tanks on the front. He had a long gun, pointed toward the ground. Otis Wilson had called to her and she had called the ambulance, Dr. Jack Wilson and Mrs. Glen Taylor. Pearson's truck was parked on the end of the street. At that time, he approached and got in it. Mrs. Martin asked him "had he killed the man". He replied, "I have shot him;" and "call the law; I will learn him to not break up a man's family." Ellis was on the ground in front of the gas tank at the time.

R. C. Pruitt, the assistant chief of police of Hollandale, was in a cafe across the street from the city jail when he was informed that someone needed to see him. When he walked out of the cafe, he saw Pearson across the street, standing in front of the jail. He had a 16-gauge double barreled shotgun in his hand. The witness walked over and asked Pearson what the trouble was, and he replied that he had shot Johnson Ellis, — and "he probably needs a doctor." Pearson handed the gun over. It was unbreeched, the empty shell in the right barrel and the unfired No. 6 shot shell in the left were both taken out. Pearson gave himself up and was put

in jail. After the lock-up, the officer went to the scene, where he saw oil cans scattered about 5 to 10 feet from the body, and oil was around the body and running off on the ground. His description was in agreement with that of the other witnesses.

Harold Shaw, chief of police, went to the scene. He said that there were good sized holes in the cans; and that he put them in a paper bag. He identified 2 of the cans and exhibited a cardboard, with shot holes, which he had cut off the case. He went back to the police station and was there present, with officers Matthews and Pruitt, when Pearson, in the jail, knocked on the door and said he wanted to talk.

A. L. Matthews, a deputy sheriff of Washington County, saw Shaw and Pruitt at the police station. After talking to these officers 3 or 4 minutes, they heard a rap on the jail door. Pearson wanted a drink of water. The witness told him to come in and get it. Pearson did so. It was then about 7:00 o'clock in the morning. Matthews asked Pearson if he had anything he wanted to tell. Pearson asked if he had to, and Matthews advised him that he did not, that he had a right for an attorney, and there was a telephone if he wanted to use it; but that if he had anything to tell him, he would listen; and if not, he had other things to do. Pearson said that he wanted to talk and that he could see a lawyer after he got to Greenville. He then walked over to the desk and sat down. The officer had known him about 15 years. He appeared to be "somewhat emotionally upset" and "like he was a little nervous." At this juncture, the evidence concerning the admissibility of the statement by Pearson was heard in the absence of the jury, adjudged to be free and voluntary and to be admissible.

Succinctly stated, Pearson's account of the transaction was as follows: Ellis had been giving him trouble with his wife for several years. He went to the station

that morning and told Ellis if he did not leave town — he would be back — and if he had not left town, he was going to kill him. He had been that morning over to his sister's home, then had come back, and had gone to the cabin where his ex-wife, "Doll", was, and that he brought her down to open the store which she had been operating for him a few days. That was when he got the shotgun, went back to the service station, told Ellis that he had already asked him to leave town, and that he had given all the trouble that he was going to take about his wife. He said that he got to the station, walked around it, and Ellis was coming out of the building with a case of oil in his hand. He said that he told Ellis to put the oil down, but he would not do so. He said that he shot him, but he was actually trying to shoot his privates off. Then he told Ellis if he did not stop hollering he was going to shoot him again. After that, he went to the police station and gave up to officer Pruitt. On cross-examination of officer Shaw, it was brought out that Pearson also said that, several months before, he caught his wife and Ellis together in the store, and he told Ellis at that time to stay away from his wife or he would kill him. Officers Pruitt and Shaw, in their evidence, fully corroborated the statement of Deputy Sheriff Matthews.

Drs. Jack K. Wilson and George F. Archer testified in effect that the cause of death was the blast of a shotgun in the abdomen about the region of the navel, fired from a short distance, and that it was a fatal wound.

When the State rested, the defendant made a motion for a directed verdict of not guilty which was denied.

Jack A. Newton, a witness for the defendant, testified that he had property near the city cemetery; and that he knew the automobiles owned by the deceased Ellis and Mrs. Grace Pearson. On inquiry as to whether the witness had occasion to see Mrs. Pearson and the

deceased anywhere near his property, the same was objected to and sustained.

The defendant then moved the court for permission to take the stand in his behalf for the limited purpose only of showing an overt act on the part of the deceased toward him so as to lay a proper predicate for the admissibility of the proffered testimony. This limited appearance was to be out of the presence of the jury. This motion was denied.

The State then made a motion to suppress and exclude the testimony of the witness Jack A. Newton which had already been adduced before the jury, on the ground of irrelevancy and immateriality, but this motion was overruled and denied.

The proffered evidence of Jack A. Newton was continued outside the presence of the jury. The witness had observed Ellis and Mrs. Pearson parked in the cemetery half a dozen times. On one occasion, about ten days before the killing, Pearson asked him about this, and he merely replied that this had happened.

Wash Bishop, outside the presence of the jury, testified that he was the cemetery caretaker. Pretty regularly he had seen Ellis and Mrs. Pearson in the cemetery, usually about 8:00 A. M. Mr. Pearson had asked him about this and wanted to know if he had seen them loving one another, and he told him he had not.

Alex Savannah testified that he had seen Ellis and Mrs. Pearson together four times. Twice they were in the same car, but the places were different. He saw them in the store hugging and putting their arms around each other.

Billy Ray Allen was an employee of the Rose Oil Company. He testified that Mrs. Pearson had brought food to Ellis. There were frequent telephone conversations between them. He finally forbade Ellis the use of his car in meeting with Mrs. Pearson, when he found out about such meetings. On the day when the inventory

was to be taken by a representative from Vicksburg, Ellis told him that he "had to be away"; that Mrs. Pearson already had the room; and that he could not stay away. Ellis left at 2:00 P. M. and did not return until 5:00 or 6:00 P. M. Pearson later asked Ellis about their relations, and he told Ellis what he had heard. He also talked to Ellis about Pearson's inquiry made of him. Ellis did not appear to be afraid, in fact, he said that he was not afraid; that the "Old Bear" was not going to do anything; and that he was just going to growl.

Frank Gaines, out of the presence of the jury, merely said that he had seen these parties together.

William Stacy Kellum, out of the presence of the jury, testified that he had seen Ellis and Mrs. Pearson together a number of times. One occasion was about the last of August 1963, between 3:00 and 4:00 P. M. He saw them rendezvous on the eastern road near Leroy Percy Park. They parked on this road and left the pickup truck. She got in the car with Mr. Ellis and they drove off in the direction of the woods.

Bill Lowery, out of the presence of the jury, testified that Pearson wanted to talk to him; that he was trying to plant beans and keep the store open; and that he was worried about his family. He then had a conversation with Ellis and expressed his concern for both. The subject was this trouble between them. He said that it kind of tickled Ellis at first — he laughed a bit. He said "Did Mr. Pearson tell you he was going to kill me? I told him "No, sir, he didn't." He then said that he knew he was talking out of turn and maybe he should not talk, but that he was worried about what might happen under the circumstances. Ellis' comment was "Don't worry about it; if he was going to kill me he would have killed me a long time ago." That was on Saturday morning before the killing occurred the next morning.

None of the evidence which was offered in the absence of the jury was admitted by the court, after motion for admission had been made.

Pearson, in his own behalf, after giving a personal history, told about his coming from the field one day and unexpectedly finding Ellis in the store with Mrs. Pearson sitting in his lap. At that time, he told Ellis that he had been running after his wife for a long time and that he had a bellyful of it; that he had three little girls whom he loved; that he did not want his home broken up; and for him to stay away from her. Ellis left reluctantly and acted in a "belligerent manner about it." He and his wife had a fuss. She told him that she liked Ellis. She moved out and never returned to his bedroom again. She left with the children on June 4, and went to Vicksburg. On June 23, he had called his wife over the telephone and asked her to bring the children up to see him. She came that night. He had them at his home, but she left with them about midnight, going back to Vicksburg. He did not want to remain at his home and so, he went out on Highway 82 to the home of his sister, Mrs. Gilbert Weeks, where he spent the balance of the night merely talking. He went back to Hollandale, to the store, after leaving his sister, but he could not stay there. He went to the house, changed his clothes, and decided to go to Vicksburg. However, after he had almost reached Percy, he decided that it would be best to come back. On the return, he was approaching the Rose Station, saw Ellis on the North side, and stopped to talk to him about this trouble. Ellis' reply was "I don't have to talk to you, and I don't have to leave. If you want anybody to go, you go." With that Ellis started toward the accused, and put his hand in his righthand pocket like he was going to attack. Pearson hurried away and went to the store where he got his shotgun, and loaded both barrels. He then went back to the station, determined to talk to Ellis. After stopping

on the north side, he walked around the side of his pick-up truck. Just then Ellis came out of the station with the case of oil in his hands. He tried to get Ellis to put the oil down and talk to him, as he meant to have an agreement of some kind with Ellis that day. He asked him the second time to put the oil down; but Ellis turned to the left, and started toward him with the oil raised like he was going to throw it at him. Pearson said that he pulled the shotgun off the seat of the pickup and fired one shot at the box of oil, not the man.

Pearson did not remember telling Mrs. Martin anything except to call the law and a doctor. He did not remember that he told officer Pruitt that he had shot Ellis. Instead he told him that he had shot a box of oil, and Ellis might be hit.

 ██ The appellant contends that the statement or confession was not admissible; and he bases this contention largely on the case of Escobedo v. Illinois, 378 U. S. 478, 84 Sup. Ct. 1758, 12 L. ed. 2d 977 (1964). In that decision, the Supreme Court of the United States, by a majority vote, at page 986 of 12 L. ed. 2d, laid down the following principle:

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 US, at 342, 9 L ed 2d at 804, 93 ALR 2d 733, and that no statement elicited by the

police during the interrogation may be used against him at a criminal trial.''

In the present appeal, there was no question as to the identity of the killer — he walked into the police station, of his own accord, with a double barreled shotgun in his hands. When the officer asked what was the matter, he replied that he shot Ellis and he probably needed a doctor. After his incarceration in the jail, about 7:00 o'clock that morning, when the officer returned from an investigation of the scene, there was a knock on the jail door. When an answer was returned and the appellant asked if he might have a drink of water, he was assured that he could do so, and he was directed to the water fountain. When the officer inquired whether he had anything to tell, and the appellant asked if he had to do that, the officer promptly advised him that he did not; that he was entitled to an attorney; and that the telephone, there in the room, was available to him. Actually there was a suggestion that he had better wait to say anything until he had consulted with an attorney; and that, if he did not have anything to say, the officer had to be about his other duties. The appellant then said that he would just go ahead and tell and that he could see a lawyer after he got to Greenville.

■■ ■ In the present case, the appellant was taken into custody on his voluntary admission that he was the offender. There was no interrogation. It was explained to him that he did not have to make any statement about the matter, that he was entitled to an attorney; that it would perhaps be better for him to wait for an attorney's advice, and his attention was called to the telephone by which he could then get in touch with an attorney. No pressure of any kind was brought upon the appellant by the officers or anyone else. It is not claimed or even suggested that he was threatened, or that any promises of any kind were extended. If there

was ever a free and voluntary statement and admission by an offender, this is such a case. The admission and confession was free and voluntary and was admissible beyond the peradventure of a doubt. The Mississippi cases on this subject are legion. Some of them are Nicholson v. State, 235 Miss. 273, 108 So. 2d 842 (1959); Thompson v. State, 231 Miss. 624, 97 So. 2d 227 (1957); Johnson v. State, 223 Miss. 56, 76 So. 2d 841 (1955), cert. den. 349 U. S. 946, 75 Sup. Ct. 874, 99 L. ed. 1272 (1955); Holmes v. State, 56 So. 2d 815 (1952), not reported in Mississippi Reports; and authorities cited in those decisions.

The appellant also contends that the court erred in refusing to let him take the stand as a witness in the absence of the jury in order to show an overt act toward him at the time of the fatal difficulty.

 ██ Self defense is an affirmative plea. While we are taught that "as a man thinketh in his heart, so is he," at the same time others can judge him only by what his acts, either in words or conduct, imply. He can say what he intends, but it is indeed a truism that what one does speaks so loud that others cannot hear what he says.

In Pitts v. State, 211 Miss. 268, 290, 51 So. 2d 448, 457 (1951), this Court said:

"The right to kill in self-defense is founded on necessity, real or apparent. 26 Am. Jur., Homicide, Sec. 137. In order to justify or excuse the taking of human life in self-defense, 'the danger of peril of loss of life or the infliction of serious bodily harm must be or appear to be, impending and emminent . . . so urgent and pressing that it is necessary for him to kill in order to save himself . . . .' Citing C. J. S., Homicide, Sec. 123, p. 1000."

The above rule was followed in Denham v. State, 218 Miss. 423, 67 So. 2d 445 (1953). In that case it was pointed out that while Denham testified that he believed

that Kemp, in going toward his clothes, was trying to get a gun and that his shooting of Kemp was in self-defense, there was no evidence whatever that he had any fear or apprehension for his life or safety so far as his wife was concerned.

■■ ■ The evidence, which was proffered by the appellant and excluded by the court, dealing with the relationship between the deceased and Mrs. Pearson, was insufficient to constitute threats on the part of the deceased. The illegitimate relationship between Ellis and Mrs. Pearson did not license the killing. ■■ ■ The killer, who overtakes his mate in the act of adultery, in the charity of the law, is still guilty of manslaughter. Denham v. State, *supra*.

The case of Brown v. State, 22 Miss. 166, 40 So. 737 (1906), cited by the appellant, is not in point. In that case, there had been a *previous difficulty*. In the present case, the excluded evidence did not show a difficulty. Neither did it show threats by the deceased against the appellant. On the contrary, that evidence showed a disbelief of fear on the part of Ellis that Pearson was going to harm him.

■■ ■ The action of the court evinced in no way the purpose to require the appellant to present his case in any particular way of manner. The court simply refused to permit inadmissible and incompetent evidence to be introduced. Consequently, the court's action is not subject to the condemnation of Bell v. State, 66 Miss. 192, 5 So. 389 (1888), as well as other cases, cited by the appellant.

Actually the case of Cain v. State, 135 Miss. 892, 100 So. 578 (1924), is directly in point on this question. While the statement of facts is lengthy, the applicable part is focused where the accused attempted to show by the witness Irwin that he had a conversation with Holly, the deceased, on Friday before the killing occurred on Monday; that he upbraided Holly for taking Cain's wife

away from him; that Cain was liable to hurt him; that he should stay away; that Holly at first protested that he was innocent and then acknowledged that he was going to take Cain's wife and marry her; "that Cain was a damned cur and won't do anything" and that he was not afraid of him. The trial court excluded this evidence, saying that it was simply an effort to inject into the case the so-called unwritten law. That ruling by the trial court was approved by this Court.

Manifestly, the court was correct in refusing to admit the evidence which did not amount to threats of any kind.

The appellant also contends that he was entitled to have his requested peremptory instruction for the jury to find him not guilty, on the ground that his statement afforded complete justification. The basis of this contention is the rule so clearly set out in the case of Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933), which has been subsequently cited many times in the authorities of this jurisprudence.

The facts, as stated in the foregoing summary, demonstrate clearly that this rule has no application in the present case.

Finally, the appellant contends that the action of the court, based on a special bill of exceptions which arose out of an incident during the State's closing argument to the jury, constituted reversible error.

Both the State and the defendant secured a number of written instructions. Several of the instructions for the defense dwelt on the alleged peaceful purpose and intention of the defendant to seek a settlement of the trouble, which had arisen as a result of alleged improper relations between the deceased and the defendant's wife. Those instructions were grounded upon the principle that, if such was the approach of the defendant, and the deceased, in turn, assumed a hostile manner toward the defendant and evinced the intent to inflict great

bodily harm upon him, and that there was imminent danger that such design would be accomplished, then the defendant was not required to wait until the deceased commenced an actual attack upon him, but had a right to anticipate the action of the deceased and shoot him if it reasonably appeared to be necessary to the defendant for his self defense.

Counsel for the State was making a strong argument for conviction. The record shows the statements by counsel, the objections by opposite counsel, and the actions by the court as follows:

"And, gentlemen, when you find yourselves as citizens serving here as jurors in such a case as this, there is only one thing for you to fall back on, and that is the *law*, and it is not the law that a husband, if he even knew, if he knew that his wife had been unfaithful to him, if he knew that his wife had been unfaithful to him with a particular man, had any right or justification or authority of law to kill a man.

MR. MERIDETH: Objection.

BY THE COURT: Let the objection be noted, and counsel is cautioned not to pursue that line any further, and the jury is instructed to disregard it. You may proceed.

MR. MERIDETH: We move for a mistrial.

BY THE COURT: That motion is DENIED.

MR. WEBB: I shall not pursue anything further with reference to husband and wife? (MR. WEBB CONFERS WITH THE COURT)

MR. WEBB: (To jury) *The consultation has been for clarification of the Court's ruling, and counsel has been permitted to make this statement to you, and that there is nothing in these instructions nor in the law which would justify the defendant in killing or give him any authority of law in killing the deceased because of any knowledge that he had of any infidelity*

*between the deceased and his wife. That is the state-
ment that we are making.*

MR. MERIDETH: I would like to make an exception
of the same nature and request that the jury be in-
structed to disregard it.

BY THE COURT: That motion is DENIED.

MR. MERIDETH: We now make a motion for a
mistrial.

BY THE COURT: That motion will be DENIED.

ARGUMENT CONTINUED BY MR. WEBB:

You gentlemen have understood what I have said
to you, I have stated it twice very carefully, and the
Court has permitted me to state it to you, and if it
was not proper, the Court would not have allowed
me to do that and I would not have proceeded with
it.'' (Emphasis supplied).

The learned trial judge, when the first statement was
objected to, evidently realized that counsel was tread-
ing on dangerous ground, for he cautioned counsel not
to pursue that line any further, and the jury was in-
structed to disregard it. Immediately, the counsel con-
ferred with the judge. This was in the presence and
sight of the jury, but the conversation between the two
was evidently not audible because the court reporter
did not report the conversation between them. Follow-
ing the consultation for clarification, as it was denomi-
nated by the counsel, the jury was informed by counsel
that he "has been permitted to make this statement to
you." The permitted statement was of the same scope
and character as the previous statement which had been
condemned and which the judge had instructed the jury
to disregard.

In the first place, circuit judges must give in-
structions in writing. Miss. Code Ann. sec. 1530 (1956).
This mandate to him can not be nullified by his per-
mitting counsel to give an oral instruction for him, or
orally alter one already given by him.

This was a very unfortunate development. Circuit judges in this State have great power and have always been highly honorable and respectable officers. In the case of Green v. State, 97 Miss. 834, 838, 53 So. 415, 416 (1910), in recognizing the great influence of these officers and the worthiness of the occupants of this honorable position, it was said:

"It is a matter of common knowledge that jurors, as well as officers in attendance upon court, are very susceptible to the influence of the judge. The sheriff and his deputies, as a rule, are anxious to do his bidding; and jurors watch closely his conduct, and give attention to his language, that they may, if possible, ascertain his leaning to one side or the other, which, if known, often largely influences their verdict. He cannot be too careful and guarded in language and conduct in the presence of the jury to avoid prejudice to either party. 21 Ency. P. and P. 994, 995, and notes. The court will not stop to inquire whether the jury was actually influenced by the conduct of the judge. All the authorities hold that, if they were exposed to improper influences, which might have produced the verdict, the presumption of law is against its purity; and testimony will not be heard to rebut this presumption. It is a conclusive presumption."

The above excerpt was approved and followed in Collins v. State, 99 Miss. 47, 51, 54 So. 665-66 (1910). It was again repeated in Dickinson v. Koenig, Admr., 242 Miss. 17, 133 So. 2d 721 (1961).

■■ ■ The Court has a very high regard for the learned judge who presided over this trial, and feels certain that it was not his purpose to become a partisan or to influence the verdict of the jury. However, the jury could have thought that the judge was, in fact, telling them that the defendant was without any defense, and was urging them to convict; and that, since they

did not know just what was being said between the judge and the attorney, the judge was throwing the weight of his influence behind the prosecution. Judges should not, at any time, during a trial, manifest hostility toward a defendant; but at all times, should appear fair and impartial.

As heretofore stated in the cited cases:

*"The court will not stop to inquire whether the jury was actually influenced by the conduct of the judge. All the authorities hold that, if they were exposed to improper influences, which might have produced the verdict, the presumption of law is against its purity; and testimony will not be heard to rebut this presumption. It is a conclusive presumption."* 99 Miss. 47, 51, 54 So. 665-66. (Emphasis supplied).

■■ ■ For the error, growing out of this incident in the closing argument, the cause must be and it is, reversed and remanded for a new trial.

Reversed and remanded.

*Rogers, Brady, Patterson and Inzer, JJ.,* concur.