484 So.2d 1002 (1986)
Nazareth GATES
v.
STATE of Mississippi.
No. 55362
Supreme Court of Mississippi.
February 26, 1986.
*1004 Roy Pitts, Meridian, for appellant.
Edwin Lloyd Pittman, Atty. Gen., by Anita Mathews Stamps, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, P.J., and SULLIVAN and ANDERSON, JJ.
SULLIVAN, Justice, for the Court:
In the late afternoon of June 23, 1983, Gates shot and killed Willie Hughes with a 30-30 rifle in Starkville, Mississippi. Gates turned himself in and confessed to the shooting. He was indicted for murder. His trial was continued until the October, 1983, term.
On the first day of the trial, Gates requested another continuance on the ground that a material witness was absent. This motion was overruled and the case proceeded to trial. When the prosecution rested, Gates moved for a directed verdict but was overruled. When the trial ended, Gates renewed his motion for a directed verdict and requested a peremptory instruction of not guilty. This motion was overruled and the instruction was refused.
Upon the verdict of guilty, Gates was sentenced to life imprisonment and perfects this appeal.

I.

WAS IT ERROR TO REFUSE THE MANSLAUGHTER INSTRUCTION, No. D-8?
As the trial judge found no elements of manslaughter in the evidence, he refused instruction D-8. However, he did grant a self-defense instruction.
Harper v. State, 478 So.2d 1017 (Miss. 1985), sets out the test to be applied to determine when an instruction on a lesser included offense should be submitted to the jury:
[A] lesser included offense instruction should be granted unless the trial judge  and ultimately this Court  can say, taking the evidence in the light most favorable to the accused, and considering all reasonable favorable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of the lesser included offense (and conversely not guilty of at least one essential element of the principal charge).
Id. at 1021.
Mississippi Code Annotated § 97-3-35 (1972) provides as follows:

*1005 The killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter.
By his own statement given shortly after the incident, Gates and Jamie Humphries were in her car when Gates saw his wife, Shirley Gates, in a truck with Hughes. According to Gates, Hughes cursed Gates so Gates followed him until they arrived at the Texaco service station. At this point, Gates got out of his vehicle with the rifle. He intended to whip Hughes, but when Hughes got smart and cursed him Gates lost his head and shot Hughes.
Scott Jones saw the shooting. According to Jones, Hughes was unarmed and appeared calm. He made no movement toward Gates. Gates appeared upset. Gates shot Hughes in the chest and waived the gun at Shirley Gates and yelled at her.
Paul Hendrick corroborated the testimony of Scott Jones.
Douglas Brownlee was in the truck with Hughes and Shirley Gates. Brownlee's testimony was that Gates told Hughes in strong language to pull the truck over. When Hughes pulled into the Texaco lot, Brownlee jumped out because of the language Gates had used. He did not know if Gates was going to shoot Hughes or not. Brownlee went to the rear of the truck. Hughes got out and then Gates got out with the rifle. Hughes was unarmed and had no weapon in the truck. Hughes said nothing to Gates and made no move toward him. Gates told Hughes to get on his knees, and when Hughes did not do so Gates shot him. Finding discretion to be the better part of valor, Brownlee then fled.
Shirley Gates testified. She was not living with Hughes but was separated from Gates. Up to their arrival at the Texaco station, her testimony is the same as Brownlee's. She testified that at the station Hughes got out, unarmed, and Gates got out with the rifle. Gates accused Hughes of talking about him, which Hughes denied. Gates then told Hughes to get on his knees, which Hughes refused to do. Gates then shot Hughes. Gates told Shirley he ought to kill her too, and started hitting her with the rifle.
By stipulation, the defense was able to get before the jury an affidavit and the statement given to the police by Jamie Humphries, the unavailable witness. In the Humphries version, Hughes cursed Gates and they argued. When this argument was resumed at the Texaco lot, Gates shot Hughes.
Gates claimed that Hughes cursed him and made a move like he was going for something in the truck, so he shot him. Yet, Gates says that the two men were not arguing when the shooting took place, and his own statement made to the police after the incident made no mention of the move.
There was no evidence of a physical assault by Hughes upon Gates. Mere words, no matter how provocative, are insufficient to reduce an intentional and unjustifiable homicide from murder to manslaughter. Stevens v. State, 458 So.2d 726, 731 (Miss. 1984); Johnson v. State, 416 So.2d 383, 387-88 (Miss. 1982). Nor is this a case where the accused was entitled to a manslaughter instruction because the killing occurred after he caught his spouse in the act of adultery. Denham v. State, 218 Miss. 423, 67 So.2d 445 (1953).
When the Harper test is applied to this evidence, it cannot be said that Gates was entitled to a manslaughter instruction. The trial judge properly refused it.

II.

WAS IT ERROR TO DENY A CONTINUANCE BECAUSE OF THE UNAVAILABILITY OF JAMIE HUMPHRIES?
Mississippi Code Annotated Section 99-15-29 (1972) provides as follows:
On all applications for a continuance the party shall set forth in his affidavit the facts which he expects to prove by *1006 his absent witness or documents that the court may judge of the materiality of such facts, the name and residence of the absent witness, that he has used due diligence to procure the absent documents, or presence of the absent witness, as the case may be, stating in what such diligence consists, and that the continuance is not sought for delay only, but that justice may be done. The court may grant or deny a continuance, in its discretion, and may of its own motion cross-examine the party making the affidavit. The attorneys for the other side may also cross-examine and may introduce evidence by affidavit or otherwise for the purpose of showing to the court that a continuance should be denied. No application for a continuance shall be considered in the absence of the party making the affidavit, unless his absence be accounted for to the satisfaction of the court. A denial of the continuance shall not be ground for reversal unless the supreme court shall be satisfied that injustice resulted therefrom.
Of course, the granting or not granting of a continuance is within the sound discretion of the trial judge. In King v. State, 251 Miss. 161, 168 So.2d 637 (1964), the Court said the following:
The granting of a continuance is largely within the sound discretion of the trial court, and a judgment will not be reversed because the continuance is refused unless there has been an abuse of sound discretion... .
... Moreover, we are of the opinion that the rule set out in Lamar v. State, 63 Miss. 265, 271 (1885), applies here wherein this Court said: "In view of the frequency of these applications we deem it advisable to repeat what has been before substantially said as to the correct course to be pursued by a defendant who applies for a continuance. To begin with, he should promptly issue summonses for all witnesses who may be material for his defense; for any witness who has been served with process and who had failed to appear as commanded he should ask for an attachment, which will never be refused by the court; in capital cases he should apply for a continuance before the venire is drawn, setting out in his affidavit the names and residences of the absent witnesses, the facts expected to be proved by them, and should also show to the court what steps have been taken to secure their attendance; he should negative the idea that they are absent with his consent or procurement, and if any reasons are known to him why they are not present, these should be stated.
"If the court declines to grant the continuance he should sue out the proper process for them, and when the case is called for trial should renew his application, make such changes in his affidavit as the conditions then existing require. If the continuance is still refused, he should with unremitting diligence seek to secure their attendance pending the trial by the continued use of the process of the court; if tried and convicted he should still persist in his efforts to enforce their attendance before the expiration of the term, and on his motion for a new trial present them to the court for examination; if, with all of his efforts, he is unable to have the witnesses personally present, he should, if practicable, secure their ex parte affidavits, which should be presented for the consideration of the court, which, on the motion for a new trial, will review the whole case and correct any error prejudicial to the defendant which may appear in any part of the proceeding." (emphasis added) (citations omitted).
251 Miss. at 171-72, 168 So.2d at 641. See also, Denton v. State, 348 So.2d 1031, 1033 (Miss. 1977) (there must be an offer to show on appellant's motion for a new trial that prejudice to appellant resulted.)
Both sides issued subpoenas for Humphries on October 13, 1983, and both subpoenas were served and returned. On the day of the trial, Gates filed for a continuance on the grounds that Humphries was in the hospital due to complications in a pregnancy. The motion set forth what *1007 Humphries would testify to and said further that it was not filed for the purpose of delay but for good cause. Attached to the motion was a letter from Dr. Leroy Howell stating that Humphries was in the hospital and could not testify on October 20. Also attached to the motion was the affidavit of Gates which set out, inter alia, what Humphries would testify to.
At the motion hearing, the prosecution offered to stipulate that if called Humphries would testify as set out in the motion and part four of the affidavit, and as set out in a statement given to the police by Humphries on June 23, 1983. The prosecution of course did not stipulate as to the truth of that testimony.
The trial court overruled the motion because there was no proof that Humphries was actually in the hospital, only the letter from the purported physician. He also gave as a supporting reason the stipulation. Defense counsel announced ready, subject to the motion for continuance.
Gates had set forth what he expected to prove by Humphries in his affidavit. He arguably made an attempt to preserve the motion throughout the trial as required by King, supra; however, he made no attempt to introduce more evidence about her absence, such as substituting an affidavit of the doctor for the letter, even though the judge told him that he was not satisfied with the proof about her absence. Also, when the evidence at trial indicated that Humphries was in the hospital, Gates failed to renew his motion. The motion was not renewed at trial's end, nor was any further action taken concerning the absent witness.
More important, on both motions for a new trial, Gates made no attempt to present Humphries to the court for examination nor present her affidavit, so the court could consider it and "review the whole case and correct any error prejudicial to the defendant which may appear in any part of the proceeding." King, supra. Gates never indicated at any time that the witness would have testified in any way other than what was contained in the affidavit and statement which was stipulated to.
Gates cites several cases in support of this assignment, which are readily distinguishable. Ivy v. State, 229 Miss. 491, 91 So.2d 521 (1956), comes closest to being authority for reversal. In Ivy, the witness, defendant's wife, would have testified that the victim was the aggressor. She was the only witness who would verify the defendant's version. We held that the denial of a continuance under these circumstances was error. In so doing, it was noted that not only did the application for continuance conform with the statute but the motion for a new trial conformed with the procedure governing continuances as set out in Lamar v. State, 63 Miss. 265, 271 (1885). This procedure was followed in King, supra. Also, the Ivy motion was supported by the affidavit of the attending physician, and when this occurs a strong prima facie case for a continuance is made out. Gates never produced the affidavit of the attending physician.
The comfort offered to Gates by Ivy is cold indeed. There was no abuse of sound judicial discretion in denying the continuance.

III.

WAS IT ERROR TO EXCLUDE TESTIMONY OF A DEFENSE WITNESS ABOUT UNCOMMUNICATED THREATS BY HUGHES AGAINST GATES?
Gates offered the witness Lena Hopper to testify that Hughes had bragged to her about being the father of a child by the wife of Gates and that Hughes had told her that if Gates said anything to him about it he would kill him. The testimony was excluded. Gates admits that the statements were not communicated to him before he shot Hughes; therefore, they clearly were not relevant to the manslaughter issue.
Out of court statements offered "for the purpose of proving the truth of the matter asserted" are hearsay and inadmissible. *1008 Fuselier v. State, 468 So.2d 45, 52 (Miss. 1985).
Uncommunicated threats made by the victim may be admissible, if otherwise competent, in murder cases where the defense is self-defense and there is an issue as to who was the aggressor, since the threats are relevant to the victim's state of mind. Washington v. State, 307 So.2d 430 (Miss. 1975); Muse v. State, 158 Miss. 449, 130 So. 693 (1930); Beauchamp v. State, 128 Miss. 523, 91 So. 202, 203, 204 (1922); Mott v. State, 123 Miss. 729, 86 So. 514 (1920); Clark v. State, 123 Miss. 147, 85 So. 188 (1920); Leverett v. State, 112 Miss. 394, 73 So. 273 (1916); Echols v. State, 99 Miss. 683, 55 So. 485 (1911).
The question is essentially one of relevancy. If the uncommunicated threat is relevant, the attendant circumstances concerning the threat are also relevant and admissible to show the "nature, cause, and depth of the deceased's enmity toward the appellant". Clark, 123 Miss. at 156, 85 So. at 190. However, when the evidence deals solely with the relationship between deceased and appellant's wife, no previous difficulties between the participants nor threats, the evidence is not relevant to the victim's state of mind concerning the self-defense claim. Pearson v. State, 254 Miss. 275, 179 So.2d 792 (1965).
In Brown v. State, 88 Miss. 166, 40 So. 737 (1920), the Court laid down the following rule concerning the admissibility of uncommunicated threats:
[W]herever there is doubt, confusion, dispute, or conflict as to the origin of the difficulty, or as to who was the aggressor in the difficulty which resulted in the death, and when such fact is the pivotal one in the case, testimony of uncommunicated threats, and the nature and character of previous difficulties, wantonly provoked by the deceased, is always admissible, provided the testimony shows some overt act on the part of the deceased at the time of the fatal encounter.
88 Miss. at 171, 40 So. at 737. See also Hendrix v. State, 172 Miss. 589, 161 So. 151 (1935).
This is not a case where the excluded testimony concerns previous harassments, threats or assaults personally directed toward Gates by Hughes, nor prior attempts by Gates to get help to stop the difficulties between he and Hughes. Such testimony would be admissible. Jackson v. State, 426 So.2d 405 (Miss. 1983); Bell v. State, 443 So.2d 16 (Miss. 1983); Lee v. State, 160 Miss. 618, 134 So. 185 (1931).
When testimony is excluded at trial, a record must be made of the proffered testimony in order to preserve the point for appeal. Johnson v. State, 416 So.2d 679, 681 (Miss. 1982). Lena Hopper was asked whether Hughes had ever said anything to her about being the father of the baby Nazareth's wife, Shirley, was going to have. The state's objection was sustained. A record was made of this testimony with Hopper testifying that Hughes had bragged about being the father of the baby but she did not know whether Gates knew about the bragging. At this point in the trial, this testimony was clearly inadmissible. Pearson, supra.
With the jury back in, Hopper was asked if she had ever heard Hughes make a threat against Nazareth. The state's objection was again sustained. No record was made of this proffered testimony. Even if a record had been made and Hopper had testified as to uncommunicated threats, the testimony would have been inadmissible because, at this point in the trial, there was no doubt as to who was the aggressor and there was no evidence of an "overt act" on the part of Hughes at the time of the shooting. Brown, supra.
After Gates testified concerning the alleged move, Hopper was recalled. She was again asked whether Hughes had ever told her that Gates' wife was going to have his baby. The state's objection was sustained. No record was made.
Testimony concerning the relationship between Hughes and Gates' wife *1009 would have been admissible had there been testimony of uncommunicated threats made by Hughes toward Gates. The testimony of Hopper concerning the alleged uncommunicated threats was admissible after Gates' testimony since then there was some evidence of an "overt act" on the part of Hughes at the time of the shooting. However, the record is totally void of testimony by Hopper concerning uncommunicated threats. We cannot assume that she would have testified as contended by Gates. The point was not properly preserved.

IV.

WAS IT ERROR TO LET THE PROSECUTOR EXAMINE GATES ABOUT A PRIOR MANSLAUGHTER CONVICTION?
First, no objection was made during this testimony and the point was waived. Norman v. State, 302 So.2d 254, 259 (Miss. 1974). Second, the prosecutor was properly inquiring as to whether Gates had been previously convicted of a crime. Wells v. State, 288 So.2d 860, 864 (Miss. 1974). Third, it was Gates himself who voluntarily attempted to explain away the previous conviction while on cross-examination. There was no error.

V.

WAS IT ERROR TO GRANT INSTRUCTION S-1?
There was no objection to this instruction, and we need not consider it unless necessary to prevent manifest injustice. Billiot v. State, 454 So.2d 445, 462 (Miss. 1984). Manifest injustice is not present as the complained of instruction does not assume a material fact in issue which is the basis of the complaint. Furthermore, when the instructions are read together, it is clear that the jury was properly instructed. Johnson v. State, 475 So.2d 1136, 1147 (Miss. 1985).
The conviction and sentence of life imprisonment is affirmed.
AFFIRMED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, DAN M. LEE, PRATHER, ROBERTSON and ANDERSON, JJ., concur.