IRVING, J.,
for the Court.
¶ 1. Harvey Williams Jr. was convicted of murder by a Hinds County jury and sentenced to life in the custody of the Mississippi Department of Corrections. Aggrieved, he appeals and asserts (1) that the trial court erred in refusing to allow testimony because of a discovery violation, (2) that the State committed prosecutorial misconduct, (3) that the trial court erred in refusing to grant the defense’s motion for a continuance, (4) that he received ineffective assistance of counsel, (5) that the trial court erred in holding that the State would be permitted to impeach a witness he sought to call, (6) that the trial court erred in refusing to allow the defense to cross-examine a witness for the State regarding a prior inconsistent statement, (7) that the court erred in granting a flight instruction, and (8) that the cumulative effect of the errors committed at trial warrants a new trial.[1]
¶ 2. Finding no reversible error, we affirm.
FACTS
¶ 3. Williams shot and killed Calvin Younger outside of Jay’s Lounge in Jackson, Mississippi, during the early morning hours of June 22, 2003. Donte Hill, a passenger in Williams’s car, was later apprehended by the police. After being taken in for questioning, Hill provided an audiotaped statement wherein he implicated Williams in Younger’s murder. Thereafter, on December 9, 2003, Williams was indicted and charged with Younger’s murder. He went to trial on April 3-6, 2007. His defense was that he shot Younger in self-defense. Numerous witnesses testified; however, since Williams does not challenge the sufficiency of the evidence against him, we dispense with a recitation of all of the facts surrounding the crime, but we -will relate additional facts, as appropriate, during our analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES

1. Discovery Violation

¶ 4. Williams contends that the trial court erred in limiting the testimony of Anthony Herrington, a security guard who was working at Jay’s Lounge on the morning that Younger was killed. According to Williams, the excluded portion of Herring-ton’s testimony would have shown that Williams acted in self-defense. The record reflects that when the defense announced Herrington as its first witness, the State objected on the basis that the defense had not previously disclosed this witness to the State. The defense responded that Her-rington was, in fact, listed as a witness in Williams’s supplemental discovery given to *256 a secretary in the district attorney’s office on March 29, 2007, five days before the trial commenced. After it was determined that Herrington had in fact been listed in the discovery tendered to the State prior to trial, the trial judge allowed the State to interview Herrington outside the presence of the jury.[2] Then, the following exchange occurred between the State, the defense, and the trial judge:
[ATTORNEY FOR THE STATE]: I’m sorry, Your Honor. The fact is we talked to this individual. He has not given us any indication that he saw the victim with a gun and they’re trying to use him — well, I apologize. He did not see the victim pull a gun on Harvey Williams, Jr. He just gave us that statement. If he comes in here and makes a different representation, it’s up to the Court to decide if that’s going to be allowed. He just told myself and [the other prosecutors and an investigator] that he did not see Calvin Younger pull a gun on Harvey Williams. And he can’t testify to that.
What he told us was Calvin Younger had a gun earlier that day, that he kicked Calvin Younger off the premises, that Calvin Younger and — Harvey Williams rode up on the scene. Calvin Younger walks up to him and he walked behind the car and he doesn’t see anything. He does not stop. Then the next thing he hears are gunshots. He had no knowledge that Calvin Younger pulled a gun on Harvey Williams. No knowledge of that, according to his representation to myself, [the other prosecutors and a detective]; therefore, his testimony is irrelevant to this case.
The fact that Calvin Younger had a gun prior to this does not show that Mr. Williams knew — first, he has to know— have knowledge of imminent danger to his life. If he does not know that then there’s no relevance to this individual’s testimony based on the fact that he did not see Mr. Younger pull a gun on Mr. Williams.
[ATTORNEY FOR THE DEFENDANT]: Well, I spoke to him today too because it’s the first time I have actually met him was today. And the way I understood his testimony — I don’t know what he’s going to say when he gets on the stand.
[ATTORNEY FOR THE STATE]: Well, that’s the problem, Your Honor.
[ATTORNEY FOR THE DEFENDANT]: That’s why I requested a continuance. That is the problem. You’re exactly right. That is a problem.
[ATTORNEY FOR THE STATE]: But you only found him on last Tuesday.
[ATTORNEY THE DEFENDANT]: Excuse me?
[ATTORNEY FOR THE STATE]: You only found him Tuesday.
[ATTORNEY FOR THE DEFENDANT]: I only found him Tuesday?
[ATTORNEY FOR THE STATE]: He told us that you — Max Mayes[3] called him last week.
THE COURT: Just a minute.
[ATTORNEY FOR THE DEFENDANT]: I apologize, Your Honor.
*257 [ATTORNEY FOR THE DEFENDANT]: Do you want me to tell you what he told me today?
THE COURT: Yes.
[ATTORNEY FOR THE DEFENDANT]: What he told me today was, if I remember correctly, is that that night Calvin Younger and his crew came to the club. He had a gun, if I can— somewhere, I think in this area. And he wouldn’t allow them [sic] him in the club; that Calvin Younger then went toward Charlie’s which was a club next door going north in that area with his crew; that when Mr. Williams drove up — he saw Mr. Williams park in the middle lane, the turning lane of the [sic] Medgar Evers going south, which is what he said, and that at that — when Mr. Williams got out of the car, came across the street walking up between cars, going toward the front door of Jay’s; that he saw Calvin Younger coming from the area of Charlie’s talking— moving his hands talking and that at some point he made a motion toward the back — his back pocket. I’m actually trying to remember everything. And at this point I can’t tell you if he even said that he saw him actually shoot. I don’t think he said he saw him shoot the gun but the inference was that he had a gun, he carried it in the back. He may have even said in the small of his back.
THE COURT: Where are your discovery responses?
[ATTORNEY FOR THE STATE]: The court can read them but none of that is in there.
[ATTORNEY FOR THE DEFENDANT]: And I didn’t have that until today and I don’t even have it now.
[ATTORNEY FOR THE STATE]: The individual did inform us that he gave a statement to Max Mayes and knowing how Mr. Max handles his investigations from working in our office, Max Mayes takes notes on everything. For her not to have those notes seems like something may be missing, Your Honor.
THE COURT: Well, the certificate of the attorney for the defendant states that on the 29th day of March, 2007, the document was delivered to the District Attorney’s Office. Of course, accepting that as [sic] face value, I find that the attorney’s certificate is sufficient to establish that there was compliance, although somewhat late in time with the discovery requirement under the uniform circuit and county court rule 9.04. However, the statement contained in the discovery states that the "witness will testify as to the reaching in the back pocket, arguing with Harvey Williams, and that witnesses on the crime scene did not — the police on the crime scene did not search the parking lot immediately adjacent to the club or near the street. And the court is going to restrict the testimony of this witness to those matters, in fact, set forth in answering questions outside the scope of the discovery provided to the State.
¶5. In Morris v. State, 927 So.2d 744 (Miss.2006), the Mississippi Supreme Court reinstated the judgment of the circuit court and reversed this Court’s decision, which had reversed Christopher Morris’s conviction and sentence and remanded the case for a new trial, because the trial judge prohibited the testimony of critical defense witnesses. Morris was charged with simple assault on a law enforcement officer. Id. at 745-46(¶ 2). On the day that his trial was set to begin, his attorney presented the State with a list of witnesses for the first time. Id. at (¶ 3). The State made an ore tenus motion to exclude the previously undisclosed defense witnesses. Id. The State argued that it was prejudiced by the defense’s *258 late disclosure, as it had no way of knowing what the proposed witnesses might testify to. Id. Thereafter, the trial judge allowed the defense to proffer each of the witnesses’ testimonies. Id. The trial judge then allowed some witnesses to testify while refusing others. Id. On appeal, Morris argued that the trial court erred in disallowing the testimony of two of the witnesses. Id. at (¶ 6).
¶ 6. Although the supreme court reversed this Court, it agreed with this Court’s finding that the issue presented was one which implicated the Compulsory Process Clause of the Sixth Amendment to the United States Constitution, as the “[t]he Compulsory Process Clause bestows upon a criminal defendant ‘the right to compel the presence and present the testimony of witnesses.’ ” Id. at 747(¶ 7) n. 1 (citing Taylor v. Illinois, 484 U.S. 400, 409, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)). The Morris court stated that:
In criminal cases which have issues pertaining to the exclusion of evidence or witnesses due to discovery violations, we look to Mississippi Rule of Uniform Circuit and County Court Practice 9.04(1), which provides that, if, prior to trial, the circuit court is made aware of one party’s failure to comply with an applicable discovery rule, it has the discretion to allow such evidence to be presented at trial, to grant a continuance, or to enter such an order as it deems just under the circumstances. If the circuit court determines that the defendant’s newly-discovered evidence or witnesses are prejudicial to the State, the State must ask for a continuance so that it may review the evidence or interview the witnesses and thus become prepared to counter the same. Even if the State does not ask for a continuance, the circuit court cannot exclude the evidence. Carraway v. State, 562 So.2d 1199, 1203 (Miss.1990). To do so would be to violate the Compulsory Process Clause.
There is an exemption to this procedure, however: if the circuit court determines that the “defendant’s discovery violation is ‘willful and motivated by a desire to obtain a tactical advantage,’ ” the newly-discovered evidence or witnesses may be excluded. Id. at 1203 (quoting Darby v. State, 538 So.2d 1168, 1176 (Miss.1989)); see also Taylor, 484 U.S. at 415, 108 S.Ct. 646, 98 L.Ed.2d 798. We find Morris’s discovery violation was willful and motivated by a desire to obtain a tactical advantage, and therefore the circuit court, even though it did not use the proper procedure, properly excluded the evidence. The only reason proffered by Morris for failure to designate these witnesses sooner was the police department’s failure to find these witnesses and give the names to Morris through discovery. The record shows that, while defense counsel had two hearings in federal court the week prior to Morris’s trial, defense counsel had represented Morris since the arraignment which was held approximately six weeks prior to the trial. Morris violated the discovery rule by failing to give the State the defense’s witness list when the State provided its list to defense counsel. Defense counsel waited until the weekend prior to the trial, which began on a Monday, to find defense witnesses. Finally, and most importantly, instead of giving the list of defense witnesses to the State one or two days prior to trial, defense counsel waited until the morning the trial began. To blame the prosecution or the police department for his own failure to investigate and failure to abide by the discovery rules is disingenuous at best. This issue is without merit.
Id. at (¶¶ 8-9) (emphasis added).
¶ 7. It is noteworthy that the trial judge in Morris did not give a reason as to why *259 he disallowed the testimonies; nevertheless, the supreme court found the violation to be “willful and motivated by a desire to obtain a tactical advantage” and concluded that the trial judge did not err in denying the defense the right to call them. Id. at (¶9).
¶ 8. While our facts differ from those in Morris, we believe that Morris is helpful. As in Morris, the trial judge gave no specific reason for his ruling. Perhaps more importantly, the trial judge here did not find that Williams’s failure to include in his disclosure to the State all of what Herring-ton purportedly would testify to at trial was willful and motivated by a desire to obtain a tactical advantage. Yet, the trial judge limited Herrington’s testimony to essentially what had been disclosed to the State. Williams sought to have Herring-ton testify that Herrington had turned Younger away from the club after seeing Younger with a gun. This information was not contained in the summary of Herring-ton’s testimony that was provided to the State in the supplemental discovery.[4] It is not unreasonable for the trial judge to have concluded that the defense disclosed only a portion of what Herrington would have testified to, willfully withholding the rest for the purpose of attempting to gain some sort of tactical advantage.[5]
¶ 9. Herrington testified to the following on cross-examination:
Q. And according to ... and I’m talking about right before you heard those gunshots, okay, right before you heard the gunshots and you’re looking at Calvin Younger are you telling the jury that the only thing you saw was him starting to reach behind his back?
A. And turning to the cars.
Q. Okay. You never saw him — you never saw anything else except him reach behind his back?
A. That’s it.
Q. Okay.
¶ 10. As reflected in the exchange, Her-rington did not put a gun in Younger’s hand immediately before the shooting. If the trial judge erred in limiting Herring-ton’s testimony, and we are not finding that he did, it is harmless error, at best, because of all of the other evidence of Williams’s guilt that was presented to the jury-
*260 ¶ 11. For example, the jury heard the testimonies of Fletcher Watts and Joe Pugh, who were with Younger at Jay’s Lounge on the morning of the shooting. Watts testified that he saw Williams exit his vehicle and fire several gunshots at Younger. Watts also disputed that Younger was reaching for or had a gun in his hand immediately prior to the shooting. Watts also disputed that they were turned away from the club that night for having guns in their possession.
¶ 12. Pugh corroborated Watts’s testimony that they were not denied entry to Jay’s Lounge on the morning of the shooting. Pugh stated that while they were standing outside of the club, they saw a vehicle that they recognized as Williams’s and that Younger said to him “there goes [Smokie].” He testified that the car passed them and then turned around. He stated that Williams then exited the vehicle and shot Younger with a pistol. Pugh denied removing a weapon from Younger’s body.
¶ 13. Further, Dr. Steven Hayne performed the autopsy and testified that Younger suffered a total of five gunshot wounds, two of which were lethal. Dr. Hayne described the lethal wounds as follows:
One gunshot wound struck the decedent in the mid right chest. That entrance gunshot wound was located 19 inches below the top of the head approximately 2 inches to the right of the mid chest wall. The bullet was noted to travel downward to the left going through the chest wall from front to back. It went through the sternum, the breast plate. It and [sic] also went through the heart, both the right and left ventricles of the heart. It went through the left lung and fractured a rib on the far left side where the bullet came to rest. There was extensive bleeding into the left chest cavity as well as the structure that holds the heart.
In addition to that gunshot wound there was a second lethal gunshot wound and that gunshot wound was located over the left back. The entrance was found at a point 18 inches below the top of the head. The bullet traveled markedly upward at approximately 40 degrees. It traveled slightly to the right. It went through the left lung and then exited over the upper left chest wall....
Dr. Hayne gave a brief overview of all of the gunshot wounds that Younger suffered:
So that’s a total, Counselor, of five gunshot wounds. Two lethal: One gunshot wound to the chest that was lethal; one gunshot wound to the back that was lethal. Three nonlethal gunshot wounds: One gunshot wound to the left thigh, one gunshot wound grazing the right arm, one gunshot wound striking the back of the right arm, exiting and then re-entering and traveling a short distance across the front chest wall.
¶ 14. Dr. Hayne answered affirmatively when asked by the State whether Younger’s wounds were consistent with having been shot from behind or at an angle from the side. Then, the State posed this question to Dr. Hayne: “Okay. Any wounds that you noticed that would have been consistent with individuals directly in front of each other confronting each other?” Dr. Hayne responded, “I could not exclude the gunshot wound to the right chest wall, but again, that would be a difficult wound and it would favor a person having to use their off hand if they’re right[-]handed and use their left hand.”
¶ 15. Williams testified in his own defense. He stated that when he attempted to enter the parking lot to Jay’s Lounge during the early morning hours of June 22, 2003, he was unable to do so because the *261 entrance to the parking lot was blocked. Williams stated that, as was his usual practice, he pulled into the turning lane on Medgar Evers Boulevard and waited for one of the security guards to recognize his vehicle. However, he realized that on this particular night, he was driving a vehicle that he had not previously driven to the club; therefore, he would likely not be recognized. According to Williams, he left his vehicle in the road and walked in the direction of the club in an effort to find a security guard who would remove the barrier so that he could enter the parking lot. Williams also stated that he got his .9 millimeter handgun from the seat of the car before he exited the vehicle. Williams explained that there is a grassy, hilly area in close proximity to the parking lot and that as he began to walk up the hill, he heard someone yell at him. He stated that he recognized the voice as belonging to Younger but quickly dismissed that notion because he thought that Younger was incarcerated. Williams stated that he then saw Younger walk quickly toward him. Williams recalled that Younger pointed at him and asked him, ‘What’s up, now [mother f-]?, What’s up now?” Williams stated that Younger then reached toward Younger’s back pocket and that “[w]hen he went in his back pocket, he was pulling out his pistol. He was pulling out his pistol out of his pocket.” Williams testified that he thought that Younger was going to kill him because he had pressed charges against Younger for armed robbery about one month prior to this incident. According to Williams, he pulled his gun out of its holster and immediately began shooting after he saw Younger “come up with a gun out of his back right pocket.” Williams testified that Younger kept coming at him as he was shooting and that he “slipped down a hill” as he was shooting at Younger. Williams stated that while he was slipping down the hill, Younger turned and ran down the street and collapsed. Williams testified that he then decided that it was best to leave because he did not know whether Younger had come to the club with others who might have wanted to retaliate to against him. Williams testified that he then drove to a house that once belonged to his grandmother.
¶ 16. In an effort to bolster his theory of the case, Williams offered Trinell Van Horn who was employed by the Hinds County Sheriffs Department. Van Horn testified that Younger threatened to harm Williams while Younger was incarcerated in 2003. Specifically, Van Horn testified that Younger said that “he was going to do something to [Williams].” Van Horn also stated that Younger told him that “[Younger] was going to end up catching a case.”
¶ 17. Williams also called Detective James Cornelius with the Jackson Police Department as a witness. Detective Cornelius testified that Williams had filed armed robbery charges against Younger in May 2003. Detective Cornelius stated that he investigated the matter and that Younger was subsequently arrested. Detective Cornelius also stated that Williams provided a statement wherein he accused Younger of threatening to kill him. However, Detective Cornelius testified that the report was generated on May 3, 2003, and that Younger was not arrested until May 27, 2003. Detective Cornelius noted that there is no record of Younger attempting to harm Williams during that time.
¶ 18. We find that Williams was able to put before the jury his theory of the case, that is, that he acted in self-defense, even though Herrington was not allowed to testify concerning Herrington’s alleged encounter with Younger involving Younger’s attempt to take a gun into Jay’s Lounge shortly before Williams’s encounter with Younger. The jury heard Williams testify *262 that Younger had a gun at the time of the shooting and that he aimed the gun at Williams prior to Williams’s firing the fatal shots. The jury also heard testimony for law enforcement officials, offered by the defense, that Younger had threatened Williams and had vowed to kill or do something to Williams. Although Williams’s theory of self-defense was placed before the jury, other evidence that contradicted Williams’s self-defense claim was also placed before the jury for consideration. It is well settled that “[w]hen evidence is in conflict, the jury is the sole judge of both the credibility of a witness and the weight of his testimony.” Payton v. State, 897 So.2d 921, 940(¶ 57) (Miss.2003) (quoting Weathersby Chevrolet Co. v. Redd Pest Control Co., 778 So.2d 130, 133(¶ 10) (Miss.2001)).
¶ 19. We find that the trial judge’s exclusion of the additional testimony by Her-rington was at best harmless error because, based on the totality of evidence adduced, inclusion of the additional testimony by Herrington, would not have altered the jury’s verdict. This contention of error lacks merit.
¶ 20. The dissent vehemently argues that Williams was denied a fair trial because he was not allowed to have Herring-ton testify about the alleged incident at Jay’s Lounge during which he allegedly observed Younger with a gun. As stated, after interviewing Herrington, the prosecutors advised the court that Herrington had told them that he had kicked Younger off the premises of Jay’s Lounge earlier that day after Younger attempted to enter Jay’s Lounge with a gun. As noted, the exact time of day of the encounter was not specified. On the other hand, according to the defense, Herrington had told them that he turned Younger and his accomplices away from Jay’s Lounge and that Younger and his group went next door to Charlie’s Club, where they remained until Williams drove up.
¶ 21. The record reflects that Williams’s attorneys called Herrington to the stand and made a proffer regarding an incident that is not the subject of this appeal. However, for some unexplained reason, the attorneys did not question Herrington about the encounter at Jay’s Lounge. Given the fact that the prosecutors and the defense attorneys had different versions about what Herrington had said to them about the encounter at Jay’s Lounge, it would seem that this would have been a perfect time to clear up the matter at its source. Williams’s attorneys failed to do so. After Herrington had concluded his proffer regarding the other matter and had left the witness stand, Williams’s attorneys stated again to the court what they believed Herrington’s testimony would have been regarding the Jay’s Lounge encounter. On these facts, the conclusion is inescapable that Williams’s attorneys apparently were not certain that Herrington would verify their earlier representation to the court regarding what occurred at Jay’s Lounge. In any event, had Herrington been allowed to testify about the Jay’s Lounge incident, the most that can be said about what his testimony would have been is that no one knows what it would have been. Since Williams is the proponent of the banned testimony, it is incumbent upon him to show that the banned testimony would have made a difference in the outcome of the case. He has failed to make such showing, as he has not even shown that Herrington would have testified that the incident with Younger and the gun at Jay’s Lounge occurred just before the shooting incident.

2. Character of Victim

¶22. The State filed several motions in limine prior to trial seeking to *263 have testimony regarding Younger’s prior criminal history excluded from the trial. The State also filed a motion in limine to exclude testimony from Cassandra Younger, Williams’s girlfriend and Younger’s sister, regarding Younger’s propensity for violence. The trial court granted the motions. Williams contends that the trial court erred in doing so, because the rulings prevented him from presenting his theory of the case.
¶ 23. It has long been established that “[e]vidence of a person’s character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion.” M.R.E. 404(a). However, Rule 404(a)(2) of the Mississippi Rules of Evidence provides an exception when:
Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution to rebut evidence that the victim was the first aggressor!.]
¶ 24. During her cross-examination of a witness for the State, Williams’s attorney sought a ruling from the trial court regarding how she should proceed when seeking to show Younger’s propensity for violence. The trial judge outlined the procedure in Heidel v. State, 587 So.2d 835 (Miss.1991) as follows:
There are two ways the Court can authorize this. The first procedure is the one you suggested where the Court is allowed to go ahead and let evidence in in anticipation of you bringing in the evidence at a later time which connects up the dots and then would make the evidence relevant.
The other method by which the Court obtains the same level of latitude to the defendant is that the witnesses are required to remain under subpoena and then you’re entitled to have those witnesses reappear and you develop that evidence at the time that you also establish the overt act by the victim against the defendant.
I understand the theory about the Court can instruct the jury not to disregard certain evidence but that’s a very poor way of preventing the jury from hearing admissible evidence. Most of the time the Court has allowed evidence to proceed out of sequence is during presentation of the defendant’s case in chief not during the presentation of the prosecution’s case.
It’s my understanding the rules of self-defense does [sic] place into issue the character of the victim once the issue of self-defense is raised. That’s just [p]art 1.
Part 2 of it is that there also must be an overt act of aggression by that victim before that character ever becomes relevant. The reason for that being is the most violent man on the face of the earth can be sitting in his car and somebody walk up behind him and shoot him in the back of his head. His character has absolutely no relevance to what happened to him. So there has to be something that puts in motion the aggression by the defendant.
Since you’re trying to develop this case during the course of the prosecution’s case, the objection will be sustained; however, these witnesses will remain under subpoena and available to you for you to call and develop that witness during your case [in] chief. So that objection at this point is sustained.
¶ 25. In Heidel, our supreme court held that it is within the discretion of the trial court to admit evidence of a victim’s propensity for violence, subject to the defense attorney supplying the necessary predicate *264 that the victim committed an overt act against the accused. Id. at 846. In this case, Herrington and Williams testified that Younger committed an overt act immediately prior to the shooting. Although Herrington did not say that he saw Younger with a gun in his hand immediately prior to the shooting, he stated that he saw Younger reach toward his back. Williams, on the other hand, stated that he shot Younger after Younger reached for a gun. Thus, in accordance with Heidel, the predicate was not laid for Williams’s attorney to elicit testimony regarding Younger’s propensity for violence until after either Her-rington or Williams testified as to an overt act. Accordingly, the trial judge’s ruling granting the motions in limine was proper at the time because testimony regarding Younger’s propensity for violence was not relevant during the State’s case in chief. After the defense had produced testimony regarding an overt act made by Younger toward Williams, it was incumbent upon Williams to either recall Watts and Pugh to inquire further about Younger’s reputation for violence or to call its own witness, including Cassandra, to establish this point. Williams failed to do so. Therefore, this contention lacks merit.
¶ 26. The State also filed a motion in limine to exclude the testimony of Freda Luckett regarding a conversation that she had had with Younger on the morning of the shooting. According to Luckett, Younger made threats against Williams during that conversation. The State argued that Luckett’s testimony would be hearsay that did not fall within any exception and that there was no evidence in the record that indicated that the threats were communicated to Williams. Specifically, the State provided in its motion that it sought to prohibit the defense from introducing any statements that Luckett made regarding any conversations that she had had with Younger. According to the discovery provided by Williams to the State, Williams expected that Luckett would testify that “she witnessed [sic] the decedent stating that he was going to kill, or cause substantial bodily injury to, Harvey Williams, Jr. upon seeing him.”
¶ 27. We note at the outset that even though the State contended that it sought to prohibit the introduction of the statement that Luckett had made, our review of the transcript of the motion hearing reveals that it sought to exclude Luckett’s testimony in this regard. After arguments of counsel, the trial court did not exclude Luckett’s testimony but stated that it was “going to sustain the objection at this time.” Apparently, the trial judge considered the State’s request premature.
¶ 28. In Gates v. State, 484 So.2d 1002, 1008 (Miss.1986) (citing Washington v. State, 307 So.2d 430 (Miss.1975)), our supreme court held that “[ujncommunicated threats made by the victim may be admissible, if otherwise competent, in murder cases where the defense is self-defense and there is an issue as to who was the aggressor, since the threats are relevant to the victim’s state of mind.” The Gates court also held that:
Wherever there is doubt, confusion, dispute, or conflict as to the origin of the difficulty, or as to who was the aggressor in the difficulty which resulted in the death, and when such fact is the pivotal one in the case, testimony of uncommu-nicated threats, and the nature and character of previous difficulties, wantonly provoked by the deceased, is always admissible, provided the testimony shows some overt act on the part of the deceased at the time of the fatal encounter.
Id. (emphasis added) (quoting Brown v. State, 88 Miss. 166, 171, 40 So. 737, 737 (1906)). As previously stated, no evidence *265 of an overt act by Younger had been introduced until Herrington and Williams testified regarding Younger’s actions just before the shooting. After this testimony, it would have been error not to allow Luck-ett’s testimony as to threats that she heard Younger make against Williams. However, the defense failed to call Luckett to the stand. We find no merit to this contention of error, as the trial judge’s ruling was proper at the time it was made.

3. Prosecutorial Misconduct

a. Closing Argument

¶ 29. Williams asserts that the State improperly argued that Williams was the only witness who saw Younger with a gun shortly before the shooting. Specifically, Williams contends that the following statement, among others, made by the State during its closing argument was improper: “The only person that supposedly saw Calvin Younger with a gun was, guess who, a convicted liar.” Then, a short while later, the State said to the jury: “Out of the 200 or so people out there, you don’t think there’s not one person other than Mr. Williams. He’s the only one that’s come [sic] to testify that Calvin Younger had a gun. He’s it. Out of 200 people, he’s it.” Williams argues that “[although Anthony Herrington was not allowed to testify that he saw [Younger] with a gun just prior to [Younger] being shot, [the prosecutor] knew that Herrington could testify thusly.” Williams also contends that the State told the court that during his interview with the State, Herrington had told the court that Younger was kicked off the club’s premises for carrying a gun.
¶ 30. In Foley v. State, 914 So.2d 677, 687-88(¶ 18) (Miss.2005) (quoting Burr v. Mississippi Baptist Medical Center, 909 So.2d 721, 724-25(¶ 7) (Miss.2005)), the Mississippi Supreme Court held that:
The standard of review that appellate courts must apply to lawyer misconduct during opening statements or closing arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice ... so as to result in a decision influenced by the prejudice so created. This Court has held that “any alleged improper comment must be viewed in context, taking the circumstances of the case into consideration.” The trial judge is in the best position to determine if an alleged objectionable remark has a prejudicial effect.
We note that Williams misrepresents what the State relayed to the trial court regarding Herrington’s statements made during the interview with the State’s attorneys. As previously stated, Herrington told the prosecutors that Younger “had a gun earlier that day” and that he had kicked Younger off of the premises. We find no merit to Williams’s contention that the State’s closing argument — that no one but the defendant saw Younger with a gun-was improper, as the State simply argued the facts that were in evidence. Herrington did not testify that he saw a gun in Younger’s hand immediately prior to the shooting. Further, even in the portion of Herring-ton’s pretrial statement that the trial court did not allow in, Herrington did not state that he saw a gun in Younger’s hands or pocket immediately prior to the shooting. It is error for the State to argue facts in closing argument that were not presented to the jury. See Tubb v. State, 217 Miss. 741, 743-44, 64 So.2d 911, 912 (1953).
¶ 31. Williams also argues that the prosecutor committed error during closing argument when he made the following statement:
Think about this: If Calvin Younger were such a bad person, he’d been shooting at people and robbing people *266 and handling guns all his life, how hard would it have been to get a conviction of that? If it’s so widely known, why didn’t they put on one person that—
The defense objected at this point, and the trial court sustained the objection. Thus, any error was cured at this point. “When a trial court sustains an objection, it cures any error.” Holland v. State, 705 So.2d 307, 835(¶ 91) (Miss.1997). This contention of error lacks merit.

b. Improper Questions

¶ 32. Williams contends that he was denied due process and the right to a fair trial because the State made improper statements and irrelevant inquiries during the course of his trial, including: (1) referring to Jay’s Lounge as “Killer Jay’s,” (2) asking Williams if he had ever abused Cassandra, (3) asking Williams how many children he had fathered and by how many different women, (4) asking Williams whether he liked to “show off’ and whether he had attended a “Pimp and Ho Ball,” (5) asking Pugh if he knew where Cassandra was when the State knew that Cassandra was incarcerated for murder, (6) asking Pugh whether Younger was preparing to “get himself killed” on the night of the murder, and (7) asking Herrington how many murders had occurred at Jay’s Lounge between 1999 and 2003. Williams contends that the State only had one reason for making these inquiries and that was to prejudice him in the eyes of the jury-
¶ 33. We agree that one of the prosecutors was overzealous in her representation of the State, and we do not condone the State’s behavior. However, we find any error in this regard to be harmless. Williams admitted shooting Younger. The only issue before the jury was whether the shooting occurred in self-defense. On this point, the evidence is conflicting, but the record contains a plethora of evidence indicating that the shooting was not in self-defense. The State’s witnesses testified that Williams shot Younger almost immediately after getting out of his car and that the shooting was unprovoked. There is no merit to this contention of error.
c. Mischaracterization of Dr. Hayne’s Testimony
¶ 34. Williams asserts that the State mischaracterized Dr. Hayne’s testimony as it relates to where the bullets entered Younger’s body. As noted, Dr. Hayne concluded that all of the bullets entered from either the back or the side. Thus, Williams contends that the State improperly asserted that Younger was shot four times in the back. The record reflects the following exchange between Dr. Hayne and one of the prosecutors on redirect examination:
Q. Is it not true that four out of five of those bullet wounds are from either a lateral position, going from back to front, or from the back going from back to front?
A. They’re all going back to front with the exception of the gunshot wound to the chest.
Q. So only one wound in the chest and remaining wounds are going from behind?
A. Yes, sir.
(Emphasis added). We find no merit to this contention of error, as the record clearly reflects that the State did not mis-characterize Dr. Hayne’s testimony.

I. Motion for a Continuance

¶ 35. “The decision to grant or deny a motion for a continuance is within the sound discretion of the trial court and will not be reversed unless the decision results in manifest injustice.” Ruffin v. State, 992 So.2d 1165, 1175(¶29) (Miss. *267 2008) (quoting Boone v. State, 973 So.2d 237, 241(¶ 13) (Miss.2008)). Williams asserts that he asked for a continuance because he needed more time to locate two witnesses who would testify about Younger’s propensity for violence. Williams did not request a continuance until the first day of trial. The record reflects that Williams’s trial counsel was appointed on February 22, 2006, over a year before his trial began in April 2007. Therefore, it is reasonable to conclude that she could have discovered these witnesses during that time. Furthermore, Williams’s attorney fails to offer any reason as to why she was unable to locate these witnesses during that time. Accordingly, we cannot conclude that the trial judge’s refusal to grant William’s attorney’s motion for a continuance constitutes a manifest injustice.
¶ 36. Williams also contends that a continuance was appropriate because the State was still producing discovery until a week before trial and even after the trial had begun. For example, Williams points out that the State did not produce the audiotape or transcript of Luckett’s statement until the first day of trial. Williams further contends that the ballistics report which established that Younger was shot with a .9 millimeter handgun was not tendered until immediately before trial. Because this conflicts with Dr. Hayne’s opinion in his autopsy report that three .357 projectiles were recovered from Younger’s body, Williams argues that time was wasted trying to establish that the autopsy report was incorrect. Williams fails to show how he was prejudiced by these late disclosures. First, the State did not call Luckett as a witness. Second, Williams testified that he shot Younger with a .9 millimeter handgun, and there was no evidence of anyone else shooting. Therefore, Williams could not have been blindsided by the late disclosure of the ballistics report that confirmed what Williams already knew. This issue lacks merit.

5. Ineffective Assistance of Counsel

¶ 37. Williams contends that his trial counsel was ineffective for failing to comply with discovery rules and that her failure to do so resulted in the exclusion of evidence that would have supported his theory of the case. Williams does not identify any witnesses whose testimonies were excluded, and we have found none in the record, except Herrington, who was not excluded from testifying, although his testimony was limited. We have already discussed the circumstances regarding Herrington, and there is no need to repeat that discussion here. Since Williams has not directed us to any other witnesses whose testimonies were excluded because of a discovery violation, we have nothing to review.

6. Impeachment of Cassandra

¶ 38. Williams argues that the trial court erred in holding that Cassandra could be impeached with a video that depicts her and Williams involved in role-playing. Specifically, the record reflects that the State acquired a videotape of Cassandra and Williams wherein Williams asserts that Cassandra will do whatever he tells her to do. This videotape was allegedly made at or for a “Pimp and Ho” ball. When the defense indicated that it anticipated calling Cassandra to testify about the threats that Younger had allegedly communicated to her regarding Williams, the State sought a ruling that it would be allowed to impeach Cassandra with the videotape, especially with the portion where Williams bragged that she would do whatever he told her to. The trial judge ruled that if Cassandra chose to testify, that portion of the video would be played for the jury. The State was not attempt *268 ing to use this information in its case-in-chief. Rule 616 of the Mississippi Rules of Evidence provides that “[f]or the purpose of attacking the credibility of a witness, evidence of bias, prejudice, or interest of the witness for or against any party to the case is admissible.” The trial judge committed no error.

7. Prior Inconsistent Statement

¶ 39. Williams argues that the trial court erred in refusing to allow him to cross-examine Hill regarding a prior statement that he had given to his attorney, an attorney who also had previously represented Williams. As previously stated, Hill provided an audiotaped statement to police shortly after the shooting. The statement was later transcribed. Hill subsequently gave a tape-recorded statement to the attorney who had previously represented Williams. The statement was not given to the State. Thereafter, the State filed a motion in limine seeking to prohibit the defense from introducing any statements made to the attorney. The trial court sustained the motion. The defense contends that Hill would have testified that the statement that he gave to the police was mischaracterized by the police. Williams argues that the trial judge erred in refusing to allow the statement. We find that the statement was clearly hearsay that does not fall within any exception. Therefore, it was properly excluded.
¶ 40. . Williams also contends that the trial court erred in allowing the State to use Hill’s audiotaped statement as substantive evidence by telling the jury in its closing argument that Williams’s warning to Hill to “hold your head down” constituted malice aforethought. Hill testified at trial that he could not remember whether Williams said anything to him before Williams exited the vehicle. Then, the State showed Hill the statement that he had provided shortly after the incident wherein he stated that Williams told him “if something goes on just hold your head down.” Hill testified that he heard gunshots shortly thereafter. Hill acknowledged that although he was afraid when he provided the statement to the police, the statement was a truthful account of what had transpired. Hill further stated that Williams instructed him to put his head between his legs immediately before Williams exited the vehicle. Thereafter, Hill answered questions regarding what Williams had told him as Williams exited the vehicle by saying: “That’s what I said in the statement, yes, sir” and “I said that in the statement.” After reviewing the transcript of the statement that he had given to police, Hill testified as follows:
On the part when — it was said, but I’m thinking the detective had misunderstood it or whatever how it was said. The hold your head down part, I’m thinking I had told him — I said, Hold it down and they’re saying hold your head down. I don’t understand how that— that part there is the only part that’s kind of messed up to me or whatever because I don’t remember him saying hold your head down. I remember him saying, Hold it down. That’s how I thought it was said. That’s what I had said.
Because Hill continued to testify that the officers misinterpreted what he said when he gave his audiotaped statement, the State asked the trial court for permission to play the tape of Hill’s statement to the jury. The trial court granted its request. The defense objected, and the trial court overruled the objection and allowed the tape to be played to the jury.
¶ 41. We find that even though Hill’s testimony was not consistent as to what Williams said when he exited the vehicle, Hill testified that Williams told him to hold *269 his head down as Williams exited the vehicle. As a result, this testimony was before the jury and the State committed no error in telling the jury in its closing argument that the statement constituted malice aforethought. Further, we conclude that the information on the audiotape that was played for the jury was largely cumulative of Hill’s testimony that Williams told him to hold his head down. There is no merit, to this contention of error.

8. Flight Instruction

¶ 42. Williams contends that the trial court erred in giving the jury a flight instruction. The record reflects that Williams left the club immediately after the shooting and went to his grandmother’s former residence. He testified that he did so because he was afraid that some of Younger’s friends would retaliate against him if he remained in the area. However, Deputy Cornelius stated that he was in an unmarked car speaking to another officer when he received a BOLO (be on the look out). He stated that he spotted a vehicle fitting that description shortly thereafter and began to follow it. Deputy Cornelius testified that he turned on his “blue headlight” and attempted to pull the vehicle over. However, he stated that the vehicle did not stop. Deputy Cornelius recalled that the driver turned his headlights off, causing Deputy Cornelius to lose sight of the vehicle. Then, according to Deputy Cornelius, he spotted the vehicle again and observed two individuals run from the vehicle.
¶ 48. In Tran v. State, 681 So.2d 514, 519 (Miss.1996), the Mississippi Supreme Court held that:
We have said before that caution should be invoked by a court before giving such a flight instruction. “An instruction that flight may be considered as a circumstance of guilt or guilty knowledge is appropriate only where that flight is unexplained and somehow probative of guilt or guilty knowledge.” Reynolds v. State, 658 So.2d 852, 856 (Miss.1995) (quoting Fuselier v. State, 468 So.2d 45, 57 (Miss.1985)). To decide whether a flight instruction is appropriate, this Court has set out a two-prong[ed] test. These prongs are: “(1) Only unexplained flight merits a flight instruction; and (2) Flight instructions are to be given only in cases where that circumstance has considerable probative value.” Reynolds, 658 So.2d at 856 (citing Fuselier, 468 So.2d at 57).
We find that, despite Williams’s testimony that he fled the scene out of fear, his subsequent actions render his testimony unreasonable. If Williams were genuinely afraid that someone might harm him for killing Younger, he no longer had reason to be afraid when the police began following him, as it is reasonable to conclude that the police would have protected him had anyone attempted to retaliate. Therefore, we find that it was proper for the jury to be given the flight instruction. This issue lacks merit.

9. Cumulative Error

¶ 44. Finally, Williams asserts that the cumulative effect of the alleged errors requires reversal. There is no merit to this issue, as we have found that the trial judge committed no error.
¶ 45. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. CARLTON, *270 J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, J.

. Actually, Williams raises twelve issues for our review; however, for the sake of clarity, we combine the related issues.

. The supplemental discovery contains the following statement regarding Herrington:
Employed at Garfield's, and formerly employed as security detail at Jay’s Lounge, Mr. Harrington [sic], may be called to testify that he was working at Jay's Lounge on the night of the incident and witnessed the decedent reaching in the back of his back pocket and arguing with Harvey Williams, Jr. He will also testify that he did not witness police crime scene investigators searching the parking lot or the area immediately adjacent to the club, near the street.

. Mayes is an investigator.

. Had Herrington been allowed to testify about the encounter with Younger, it is not clear exactly what his testimony would have been. As noted in the exchanges between the court and the attorneys, the attorneys for the State indicated that Herrington said that Younger had a gun earlier that day and that he kicked Younger off the premises. No time line was given as to when this occurred in relationship to the encounter between Younger and Williams. The State's attorneys also indicated that Herrington told them that he did not see Younger pull a gun on Williams and that he had no knowledge that Younger pulled a gun on Williams. On the other hand, the defense attorneys indicated that Herring-ton told them that Younger and his crew came to the club, that Younger had a gun, that he wouldn’t allow him in the club, and that Younger then went toward Charlie's which was a club next door. The defense attorneys further stated that Herrington told them that when Williams drove up, got out of his car, and came across the street walking up between cars going toward the front door of Jay's, he saw "Younger coming from the area of Charlie’s talking — moving his hands talking....” Clearly the defense’s version of Herrington’s purported testimony indicates that Younger had a gun shortly before the encounter with Williams.

. Since the defense investigator who interviewed Herrington was a meticulous and thorough investigator, the court may have concluded that it was highly unlikely that the investigator did not ask Herrington questions that would have elicited the information regarding the earlier encounter with Younger at Jay’s Lounge.